# EXHIBIT A

Exhibit A to this Sale Motion is too voluminous to attach and serve on all interested parties.  However, the APA has been filed with the Court and is publicly available via the Court's PACER website or may be obtained by request to Debtor's counsel at bmccarthy@mccarthy-lawfirm.com or dreynolds@mccarthy-lawfirm.com.

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**BRIAR'S CREEK HOLDINGS, LLC**

**AND**

**BRIAR'S CREEK GOLF, LLC**

**DATED AS OF FEBRUARY __, 2015**

# SCHEDULES*

## [TO BE REVISED]

| | |
|---|---|
| Schedule 1(a) | Real Property |
| Schedule 1(b) | Encumbrances |
| Schedule 1(c) | Assigned Contracts |
| Schedule 1(d) | Trademarks |
| Schedule 1(e) | Vehicles and Boats |
| Schedule 2.2 | Excluded Assets |
| Schedule 5.3 | Consents |
| Schedule 5.4 | Conflicts |
| Schedule 5.6 | Status of Assigned Contracts |
| Schedule 5.7(b) | Tenant Leases |
| Schedule 5.7(c) | Real Property Proceedings |
| Schedule 5.8 | Environmental Matters |
| Schedule 5.10 | Employees |
| Schedule 5.11 | Employee Benefits |
| Schedule 5.12(b) | Infringement |
| Schedule 5.12(c) | Third Party Intellectual Property Rights |
| Schedule 5.13 | Proceedings |
| Schedule 5.14 | Compliance with Laws |
| Schedule 7.4 | Pre-Closing Operations |
| | |
| Schedule 8.2(k) | Employees/Accrued Vacation |

**\*These Schedules may be amended after the execution
of this Agreement as necessary or appropriate
for completeness and/or to update information provided
and to effectuate the transactions contemplated by
the Parties to this Agreement.**

## EXHIBITS

### [TO BE REVISED]

Exhibit A    Deed
Exhibit B    Bill of Sale and Assignment
Exhibit C    Assignment and Assumption Agreement
Exhibit D    Escrow Agreement
Exhibit E    Assignment of Trademarks

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (this "Agreement") is made and entered into as of the ___ day of February, 2015 (the "Effective Date"), by and among **Briar's Creek Golf, LLC**, a South Carolina limited liability company ("Seller"), and **Briar's Creek Holdings, LLC**, a Delaware limited liability company, or its assignees ("Purchaser").

## RECITALS

A.    Seller is engaged in the business of owning, operating, developing and selling certain real property and related assets, including (but not limited to) a golf course with clubhouse, approximately one hundred (100) acres of undeveloped land and eight (8) developed residential lots, all located in Charleston County, South Carolina (the "Business");

B.    Seller plans to file a voluntary petition for relief (the "Filing") under Chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of South Carolina (the "Bankruptcy Court") on or about February 9, 2015 (the "Petition Date");

C.    The Filing will commence Seller's bankruptcy case (the "Case"), and Seller will be a Chapter 11 debtor-in-possession, having the rights and powers of a trustee (other than the right to compensation under Bankruptcy Code § 330) pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

D.    The Filing and the Case are believed to provide the best means for Seller to maximize and realize value for its assets for the benefit of its creditors, by and through a sale under the provisions of the Bankruptcy Code; and

E.    Seller desires to sell substantially all of its assets used in the Business to Purchaser, and Purchaser desires to purchase certain assets and assume certain liabilities from Seller, in a sale pursuant to Sections 363 and 365 of the Bankruptcy Code.

In consideration of the premises, the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

## ARTICLE 1

## DEFINITIONS

In addition to capitalized terms otherwise defined herein, the following terms shall have the meanings specified below.

"Accounts Receivable" means all of Seller's customer accounts receivable and rights to payment from Seller's customers.

"Alternative Transaction" has the meaning set forth in Section 10.1(a)(v).

"Assigned Contracts" means the Contracts listed on Schedule 1(c), which are to be assigned to Purchaser under Section 365 of the Bankruptcy Code, but excludes any management agreements or management contracts. Any such management agreements and management contracts related to the Business shall be terminated at the Closing.

"Assignment and Assumption Agreement" has the meaning set forth in Section 2.3.

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Avoidance Claims" means any and all claims for relief of Seller under Chapter 5 of the Bankruptcy Code.

"Bankruptcy Case" means the case commenced by Seller in the Bankruptcy Court under Chapter 11 of the Bankruptcy Code and pending before the Bankruptcy Court as Case No. 15-00712-jw.

"Bankruptcy Code" has the meaning set forth in the recitals.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Benefit Plan" has the meaning set forth in Section 5.11.

"Bid Procedures Order" means the Order entered by the Bankruptcy Court upon Seller's motion, establishing procedures for the sale of the Purchased Assets.

"Bill of Sale" means the Bill of Sale and Assignment in substantially the form attached hereto as **Exhibit B**.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day of the year on which national banking institutions in the State of South Carolina are open to the public for conducting business and are not required or authorized to close.

"Cash Consideration" means Seven Million Four Hundred Thousand and No/100 Dollars ($7,400,000.00) subject to any adjustments described in this Agreement to be made at the Closing plus the aggregate Cure Amounts.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" has the meaning set forth in Section 4.1.

"Closing Date Payment" has the meaning set forth in Section 3.3(c).

"Closing Statement" has the meaning set forth in Section 3.3(a).

"Competing Agreement" has the meaning set forth in Section 10.1(a)(v).

"Competing Transaction Sale Order" has the meaning set forth in Section 10.1(b)(iv).

"Contract" means any agreement, contract, obligation, promise, or undertaking, whether written or oral, to which Seller is a party or otherwise bound related to the Business.

"Cure Amounts" means, as to each Assigned Contract, the amount required to be paid pursuant to Section 365(b) of the Bankruptcy Code in connection with the assumption by Seller of such Assigned Contract as (a) reported on a schedule to be filed with the Bankruptcy Court at least three (3) days prior to the hearing for the approval of the Sale Order, as such schedule may be amended; (b) determined by agreement of the parties; or (c) determined by Final Order of the Bankruptcy Court.

"Deed" means the limited warranty deed transferring title to the Real Property in substantially the form attached hereto as **Exhibit A**.

"Deposit" has the meaning set forth in Section 3.2.

"Documents" means all books, records, files, supplier lists, customer lists, cost and pricing information, product specifications, advertising and marketing materials, quality control records, operating and policy manuals, training materials, research and development materials, surveys, plats, and reports.

"Due Diligence Period" has the meaning set forth in Section 7.1(a).

"Due Diligence Reimbursement Fee" has the meaning set forth in Section 10.2(c).

"Effective Date" has the meaning set forth in the first paragraph of this Agreement.

"Employees" means all persons employed by the Seller in a full-time or part-time capacity at the Business at the time in question.

"Encumbrance" means any lien, mortgage, pledge, security interest, easement, encroachment, encumbrance, third party interest, or other restriction or limitation of any kind on or in or against the Purchased Assets, other than Permitted Encumbrances.

"Environmental Laws" has the meaning set forth in Section 5.8(a).

"Equipment Leases means all leases and purchase money security agreements for any equipment, machinery, vehicles, furniture or other personal property located at the Facilities which are held by, for or on behalf of Seller and used in the Business, to the extent same are assignable or transferable, together with all deposits made thereunder, to the extent such deposits are assignable or transferable.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" has the meaning set forth in Section 5.11.

"Escrow Agent" has the meaning set forth in Section 3.2.

"Escrow Agreement" has the meaning set forth in Section 3.2.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Facilities" means the structures, facilities and related improvements located on the Real Property.

"FF&E" means all fixtures, furniture, furnishings, art work, equipment, machinery, tools, appliances, spare parts, computer hardware and other similar items of tangible personal property which are owned by Seller, located at the Facilities and used in the Business.

"Filing" has the meaning set forth in the recitals.

"Final Order" means an action taken or order issued by a Governmental Authority as to which: (i) no request for stay of the action or order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, said deadline has passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the action or order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest has passed; (iii) the Governmental Authority does not have the action or order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the action or order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; provided, however, that the availability of relief under Federal Rule of Civil Procedure 60(b) or Federal Rule of Bankruptcy Procedure 9024 shall not, by itself, render an action or Order not a Final Order.

"Final Statement" has the meaning set forth in Section 8.2.

"Governmental Authority" means any federal, state, or local government, governmental authority, or regulatory or administrative authority, or any court, tribunal, or judicial body having jurisdiction, including but not limited to the Bankruptcy Court and other courts.

"Governmental Authorization" means any Order, approval, consent, license, permit, waiver, or other authorization issued or granted by or under the authority of any Governmental Authority, including but not limited to an Order of the Bankruptcy Court.

"Hazardous Substance" means any pollutant, contaminant, hazardous waste, hazardous material, or hazardous substance as defined by or regulated under any Environmental Laws.

"Intangible Personal Property" shall mean (i) Permits, Assigned Contracts, Equipment Leases, (ii) all of Seller's rights with respect to group history, group contracts, tee times history, list of future bookings, member lists and records, (iii) all proprietary rights Seller may have with respect to the use of the Purchased Assets, and all trade names, trademarks, service marks, and Trademarks (if any), (iv) all product and service warranties and guaranties, (v) the goodwill of the business and other assets, (vi) books, records, and telephone numbers, (vii) computer programs, software, websites, domain names, and other intellectual property, and (viii) all other contract, property and other intangible rights belonging to Seller and utilized in connection with the use, ownership and operation of the Business (including but not limited to the use of the current trade names and all derivatives thereof).

4

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended.

"Inventory" means all merchandise owned by Seller located in any pro shop or similar facility and held for sale in the ordinary course of business, including, without limitation, all golf clubs, bags and balls and other golf equipment, all golf shirts, hats and shoes held for sale in the ordinary course of business; together with all food and beverages (including both alcoholic and non-alcoholic) owned by Seller which are located at any of the Facilities (whether opened or unopened) as of the Closing, including all food and beverages located in the guest rooms

"Law" means any federal, state, local, municipal, or foreign law, ordinance, rule, regulation, statute, or treaty.

"Liability" mean any liability, debt, loss, damage, fine, judgment, penalty, or obligation whether known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due.

"Liens" has the meaning set forth in Section 7.2(e).

"Liquidated Damages Amount" has the meaning set forth in Section 10.2(b).

"Liquor Application" has the meaning set forth in Section 8.3.

"Liquor License" has the meaning set forth in Section 8.3.

"Material Adverse Effect" means any event or occurrence that after the date hereof has had or would have a material adverse effect on the Purchased Assets or the Business (excluding the Excluded Assets and any Liabilities other than Assumed Liabilities), in each case taken as a whole. Notwithstanding the foregoing, any effect resulting from or arising out of any of the following shall not constitute a Material Adverse Effect: (i) the Filing; (ii) the execution or delivery of this Agreement or the announcement thereof, including the disclosure that Purchaser is a party hereto; (iii) any action contemplated by this Agreement or any of the Transaction Documents; (iv) any action taken at the request or direction of Purchaser; (v) changes in any Law or any accounting regulations or principles or any change proposed with respect thereto; (vi) any change or effect generally applicable to any industries and markets in which Seller operates including any changes in the prevailing market conditions or prices; (vii) national or international political, economic, or social conditions, including the engagement of the United States in hostilities, whether or not pursuant to the declaration of a national emergency or war, or the occurrence of any military or terrorist attack upon the United States or any of its territories, possessions, or diplomatic or consular offices, or upon any military installation, equipment, or personnel of the United States; (viii) any change or effect generally applicable to the financial, banking, securities, commodities, or derivatives markets in any country or region; or (ix) any event or occurrence of which Purchaser has knowledge as of the date hereof.

"Membership Plan" means the provisions governing membership and member rights in regard to the golf club operated on the Real Property. In this regard, in Section 5.3, "Seller's Membership Plan" refers to The Golf Club at Briar's Creek Membership Plan, dated as of March 1, 2000, as amended, the Rules and Regulations of the Club, and all other accompanying documents and all exhibits and attachments thereto; and in Section 7.12, "Membership Plan for

the New Club" refers to the new Membership Plan to be established by Purchaser for its New Club.

"Myrick Secured Debt" means the secured debt of Seller to Ed Myrick, Sr. in the principal amount of $3,900,000.

"New Club" means the golf club to be formed and operated by Purchaser as set forth in Section 7.12.

"Old Club" has the meaning set forth in Section 7.12.

"Order" means any award, writ, injunction, judgment, order, or decree entered, issued, made, or rendered by any Governmental Authority.

"Permits" means all transferrable Governmental Authorizations, licenses, permits, consents, certificates, approvals, and clearances held by Seller in connection with the operation of the Business as conducted as of the date hereof.

"Permitted Encumbrances" means: (i) with respect to the Real Property, ad valorem real property taxes for the year of Closing and subsequent years, which are a lien, but are not yet due and payable; (ii) with respect to the Real Property, all title exceptions and other matters, if any, disclosed in the Title Commitment covering the Real Property, unless objected to and removed or corrected prior to Closing as provided below (other than Required Removal Exceptions, which shall be cured or otherwise removed by Seller on or before Closing); (iii) with respect to all the Purchased Assets, any restrictions imposed by any Law; (iv) with respect to all the Purchased Assets, any Encumbrances, title exceptions, or other imperfections of title caused by or resulting from the acts of Purchaser or any of its affiliates, employees, officers, directors, agents, contractors, invitees, or licensees; (v) with respect to all the Purchased Assets (other than the Real Property), liens for Taxes not yet due and payable; (vi) with respect to all the Purchased Assets, municipal and zoning ordinances; (vii) with respect to all the Purchased Assets, the specific Encumbrances, if any, set forth on Schedule 1(b); and (viii) with respect to all the Purchased Assets, the Assumed Liabilities. In regard to the Assigned Contracts, to the extent that an Assigned Contract is substantively a secured transaction rather than a true lease or executory contract, the security interest of the other party in the property which is the subject of such Assigned Contract (*e.g.*, a security interest in maintenance equipment under a capital lease that is in substance a purchase money secured transaction) shall be a Permitted Encumbrance with respect to the property which is the subject of such Assigned Contract (but not as to any property which is not the subject of such Assigned Contract). In no event shall Permitted Encumbrances include any Required Removal Exceptions.

"Person" means any individual, partnership, corporation, limited liability company, joint stock company, joint venture, estate, trust, association, unincorporated organization, Governmental Authority, or other entity.

"Personal Property" means all the Tangible Personal Property and Intangible Personal Property.

"Petition Date" has the meaning set forth in the recitals.

"Plans and Specifications" means the rights of Seller in and to the plans and specifications, blueprints, architectural plans, engineering diagrams and similar items located at the Business or in Seller's possession which relate exclusively to the Facilities, to the extent the same are assignable or transferable.

"Post-Closing Expenses" has the meaning set forth in Section 8.2(d).

"Preliminary Statement" has the meaning set forth in Sections 3.3(a) and 8.2.

"Proceeding" means any action, arbitration, audit, hearing, investigation, litigation, proceeding, or suit (whether civil, criminal, administrative or investigative) commenced or heard by or before any Governmental Authority.

"Purchase Price" has the meaning set forth in Section 3.1.

"Purchased Assets" has the meaning set forth in Section 2.1.

"Purchaser" has the meaning set forth in the preamble.

"Purchaser Termination Notice" has the meaning set forth in Section 10.1(b)(ii).

"Real Property" means the real property legally described on Schedule 1(a), including all of Seller's rights and interests of any nature pertaining to the legally described real property, such as easements, rights-of-way and access right over lands of other parties, rights in all mineral rights and natural resources, development rights and entitlements, and other appurtenances, whether or not described in Schedule 1(a).

"Release" means any past or present spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing of a Hazardous Substance into the environment.

"Representative" means, with respect to any Person, any director, officer, employee, agent, consultant, advisor, or other representative of such Person, including legal counsel, accountants, and financial advisors (and the Representatives of each).

"Reserve" has the meaning set forth in Section 8.2(n).

"Required Removal Exceptions" has the meaning set forth in Section 7.2(e).

"Restoration Costs" means (i) in the case of damage or destruction by fire or casualty, the estimated cost to repair or replace the affected assets or (ii) in the case of a taking or threatened taking, the greater of (A) the value of the assets taken or (B) the costs necessary to restore substantially the same functional utility to the affected Facilities following the taking. The Restoration Costs shall be as mutually agreed by Seller and Purchaser or, if they are unable to agree, then shall be as determined by an engineering firm or appraisal firm mutually acceptable to Seller and Purchaser.

"Sale Order" has the meaning set forth in Section 7.7.

"Sales Taxes" has the meaning set forth in Section 8.1(a).

"Security Deposits" has the meaning set forth in Section 8.2(f).

"Seller" has the meaning set forth in the preamble.

"Seller Termination Notice" has the meaning set forth in Section 10.1(c)(i).

"Seller's Knowledge" means the actual knowledge of James M. Coyne in his capacity as General Manager of Seller.

"Supplies" means all china, glassware and silverware, linens, uniforms, engineering, maintenance, cleaning and housekeeping supplies, matches and ashtrays, soap and other toiletries, stationery, menus, directories and other printed materials, and all other similar supplies and materials, which are owned by Seller and located at the food and beverage areas of the Facilities as of the Closing, as well as all other products, supplies, score cards, and other printed materials, petroleum products, fertilizers, chemicals and other products owned by Seller and used in connection with the operation and maintenance of the Facilities.

"Tangible Personal Property" means the FF&E, Inventory, Supplies, Vehicles, Plans and Specifications, Documents and all other tangible personal property owned by Seller and used exclusively in connection with the operation of in the Business.

"Tax" or "Taxes" means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp, documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Internal Revenue Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated, or other similar tax, duty, levy, or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any transferee liability in respect of any items described in clause (i) above.

"Tax Return" means any return, declaration, report, claim for refund, information return, or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment, or collection of any Tax or the administration of any laws relating to any Tax.

"Title Commitment" has the meaning set forth in Section 7.2(a).

"Title Company" means Fidelity National Title Insurance Company or such other nationally recognized title insurance company designated by Purchaser to replace the foregoing.

"Trade Payables" means accounts payable obligations of Seller, none of which shall be assumed by Purchaser.

"Trademarks" means all trade names, trademarks, service marks and logos owned by Seller and used in the Business, whether common law, registered or application pending, listed on Schedule 1(d).

"Transaction Documents" means any agreements, instruments, or documents entered into or delivered pursuant to the terms of this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

"Treasury Regulations" means the regulations promulgated by the U.S. Treasury Department pursuant to the Code.

"Unpermitted Encumbrances" has the meaning set forth in Section 7.2(b).

"Vehicles" means the vehicles owned by Seller and listed on Schedule 1(e).

## ARTICLE 2

## PURCHASE AND SALE

2.1    Purchase and Sale.  At Closing, Seller shall sell, transfer, assign, convey, and deliver, to Purchaser, and Purchaser shall purchase, free and clear of all Encumbrances except for the Permitted Encumbrances, all right, title, and interest of Seller in, to, or under the following (the "Purchased Assets"):

(a)    the Real Property;

(b)    the FF&E;

(c)    the Inventory;

(d)    the Vehicles;

(e)    the Assigned Contracts;

(f)    the Permits;

(g)    the goodwill associated with the Business;

(h)    all Documents exclusively related to any of the Purchased Assets, provided that Seller may retain copies of such Documents;

(i)    to the extent assignable, all rights under or pursuant to all bonds, warranties, representations, and guarantees relating to any of the Purchased Assets made by suppliers, manufacturers, contractors, or other third parties;

(j)    to the extent assignable, all telephone numbers, telephone facsimile numbers, e-mail addresses, domain names, internet uniform resource locators, and other directory listings exclusively relating to the Facilities;

(k)     the name "The Golf Club at Briar's Creek" and all variants thereof; and

(l)     to the extent not otherwise included above, all such further and additional Personal Property.

2.2     <u>Excluded Assets</u>.  Notwithstanding anything to the contrary contained herein, Purchaser shall not purchase any assets of Seller other than the Purchased Assets, and, without limiting the generality of the foregoing, the Purchased Assets shall not include any of Seller's rights in, to, or under any of the following (the "Excluded Assets"):

(a)     cash and cash equivalents;

(b)     any Accounts Receivable;

(c)     any Contract that is not an Assigned Contract;

(d)     any corporate records of Seller and any Documents that are not exclusively related to the Purchased Assets, including, without limitation, any Tax Returns;

(e)     any refunds of Taxes;

(f)     any insurance policies and rights to proceeds thereof or any refund of any premiums or fees paid by Seller;

(g)     any Avoidance Claims; and

(h)     any rights, claims, or causes of action of Seller under this Agreement or any of the Transaction Documents.

2.3     <u>Assumed Liabilities</u>.  At Closing, Purchaser shall execute and deliver to Seller the Assignment and Assumption Agreement in the form attached hereto as **Exhibit C** (the "Assignment and Assumption Agreement") pursuant to which (a) Purchaser shall assume and agree to discharge and perform all post-closing Liabilities under the Assigned Contracts and all costs for which Purchaser is responsible pursuant to <u>Section 2.4</u>, and (b) Purchaser shall assume and agree to discharge the Liability for the Myrick Secured Debt (collectively, the "Assumed Liabilities").  Notwithstanding any provision in this Agreement to the contrary, Purchaser shall not assume and shall not be obligated to discharge or perform any Liability of Seller other than the Assumed Liabilities.  Seller shall remain solely and exclusively liable for all Liabilities of Seller other than the Assumed Liabilities.

2.4     <u>Contract Matters</u>.

(a)     From the date hereof through the date that is ten (10) Business Days prior to Closing, Purchaser shall have the right, by written notice to Seller, to designate any Contract not already so designated to be an Assigned Contract.  <u>Schedule 1(c)</u> shall be amended to include any such Contract as an Assigned Contract.

(b)    Seller may in its sole and absolute discretion, subject to applicable Laws, assume, assign, or reject any Contract other than an Assigned Contract at any time, provided, however, that in the event Seller intends to do so prior to Closing, Seller shall notify Purchaser of such intent and Purchaser shall have two (2) Business Days to agree to treat said Contract as an Assigned Contract.  In the event Purchaser does not agree in writing to treat said Contract as an Assigned Contract within said period, Seller may assume, assign, or reject such Contract in its sole and absolute discretion at any time.

(c)    At Closing, Seller shall pay from the Cash Consideration the appropriate Cure Amount, if any is due, to each counterparty to an Assigned Contract.

2.5    <u>Assignment of Purchased Assets</u>.  To the maximum extent permitted by the Bankruptcy Code, (a) all Contracts designated by Purchaser to be Assigned Contracts, and (b) any other of the Purchased Assets that require authorization under Section 365 of the Bankruptcy Code for transfer of Seller's interest therein, shall be assumed by Seller and assigned to Purchaser pursuant to Section 365 of the Bankruptcy Code as of the Closing Date or such other date as specified in the Sale Order or this Agreement, as applicable.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign any asset or any right thereunder if an attempted assignment without the consent of a third party, which consent has not been obtained prior to the Closing (after giving effect to the Sale Order and the Bankruptcy Code), would be legally invalid.  If with respect to any Purchased Asset such consent is not obtained or such assignment is not attainable pursuant to Sections 105, 363, or 365 of the Bankruptcy Code, and provided that such Purchased Asset is not material to the Business or to the value of the other Purchased Assets, then such Purchased Asset shall not be transferred hereunder and the Closing shall proceed with respect to the remaining Purchased Assets without any reduction in the Purchase Price.

2.6    <u>Further Assurances</u>.  Seller and Purchaser shall use reasonable efforts to take, or cause to be taken, all appropriate action, including executing and delivering such documents and other papers, as may be required to consummate the transactions contemplated by this Agreement; provided, however, that nothing in this Section 2.6 shall prohibit Seller from ceasing operations or winding up its affairs following the Closing.

2.7    <u>"AS IS" Nature of Sale</u>.  Purchaser acknowledges and agrees that to the maximum extent permitted by law, except as otherwise set forth in this Agreement, the sale of the Purchased Assets as provided for herein is made on an "AS IS" and "WHERE IS" condition and basis and "WITH ALL FAULTS".  Unless Seller and Purchaser specifically agree otherwise in writing, it is understood and agreed that the Purchase Price has been adjusted by Seller to take into account the "AS IS" and "WHERE IS" nature of the Purchased Assets and the Purchased Assets are being purchased by Purchaser subject to the foregoing and any specific disclosures made pursuant to any other paragraph of this Agreement.

## ARTICLE 3

## PURCHASE PRICE

3.1     Purchase Price.  The purchase price (the "Purchase Price") for Purchased Assets shall consist of cash equal to the $7.4 Million Cash Consideration, the assumption of the Myrick Secured Debt (which is in the approximate amount of $3.9 million) and the assumption of the Assumed Liabilities.

3.2     Deposit.  No later than two (2) Business Days after the day on which the Bid Procedures Order is entered by the Bankruptcy Court, Purchaser shall deposit $500,000 in cash (the "Deposit") by wire transfer of immediately available funds to the McCarthy Law Firm, LLC, or such other Person as may be mutually agreed upon by Seller and Purchaser (the "Escrow Agent").  The Escrow Agent shall hold the Deposit pursuant to an Escrow Agreement substantially in the form of **Exhibit D** attached hereto (the "Escrow Agreement").     Seller shall be entitled to disbursement of the Deposit (a) at the Closing, which disbursement shall be to the credit of Purchaser or (b) in the event of the termination of this Agreement pursuant to Section 10.1(c)(i) or Section 10.1(c)(ii) hereof, as provided in Section 10.2(b) hereof.  In the event of the termination of this Agreement other than pursuant to Section 10.1(c)(i) or Section 10.1(c)(ii) hereof, Purchaser shall be entitled to disbursement of the Deposit, as provided in Section 10.2(c) hereof.

3.3     Closing Date Payments.

(a)     In connection with the Closing, Seller and Purchaser shall execute a written statement setting forth all payments made, all expenses deducted, all credits allowed and all pro-rated expense items for each of Seller and Purchaser (the "Closing Statement"), which shall initially be in a preliminary form for the Closing Date and afterwards adjusted to final form as provided in Section 8.2.  At least two (2) days prior to the Closing Date, Seller shall deliver to Purchaser a written statement (the "Preliminary Statement") setting forth Seller's good faith estimate of the following as of the Closing Date: any adjustments to the Purchase Price, including, without limitation, those contemplated by Sections 3.5, 8.1 and 8.2.  Seller shall make available to Purchaser reasonable supporting documentation regarding the determination and calculation of such amounts.  Should Purchaser object to any of the amounts or calculations in the Closing Statement, Purchaser and Seller shall cooperate in a diligent good faith manner to resolve such objections prior to the Closing, and the Closing Statement shall be adjusted prior to the Closing to reflect any changes agreed to by Purchaser and Seller.

(b)     At or before the Closing, Purchaser shall be provided a list of all Trade Payables and all Accounts Receivables certified by an officer of Seller to be true and correct.

(c)     At the Closing, Purchaser shall pay to Seller in cash by wire transfer of immediately available funds to an account designated in writing by Seller an amount equal to the Cash Consideration (i) minus the sum of the Deposit, (ii) minus any credits due to Purchaser under Sections 3.5(a) and 8.1(b) and (iii) plus any credits due to Seller under Section 3.5(b) (the "Closing Date Payment"), all in accordance with the Sale Order.

12

3.4     Inventory.     Seller shall not be required to maintain any level of Inventory but shall maintain such levels in accordance with historical practices.  Any Inventory that remains on hand on the Closing Date shall be included in the Purchased Assets at the Closing.

3.5     Credits

(a)     At the Closing, Purchaser shall receive a credit from Seller for any deposits or other prepaid amounts received by Seller prior to the Closing that are for services to be performed or products to be delivered by Purchaser under any Assigned Contracts after the Closing.

(b)     At the Closing, Seller shall receive a credit from Purchaser for deposits or other prepaid amounts paid by Seller prior to the Closing that are for services or products to be received by, or that are to be paid to, Purchaser under any Assigned Contracts after the Closing.

## ARTICLE 4

## CLOSING

4.1     Closing Date.     The closing of the transactions contemplated hereby (the "Closing") shall take place at such place, date, and time as the parties may mutually agree no later than fourteen (14) Business Days following the date on which the Bankruptcy Court has entered the Final Order approving this Agreement, provided that the conditions set forth in Article 9 hereof have been satisfied or waived as of the Closing date.  However, in no event shall the Closing occur sooner than seventy-five (75) days after the date hereof or later than June 30, 2015 without the consent of Purchaser.  The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date."

4.2     Payment on the Closing Date.     Subject to satisfaction or (if permissible) waiver of the conditions set forth in Article 9 hereof, at the Closing, Purchaser shall pay the Closing Date Payment to Seller in accordance with Section 3.3(c).

4.3     Purchaser's Deliveries.     At the Closing, Purchaser shall deliver or cause to be delivered to Seller:

(a)     a certified copy of Purchaser's articles of organization (or comparable document) filed of record to create the entity;

(b)     a certificate of good standing of Purchaser issued as of a recent date by the Secretary of State of the jurisdiction in which Purchaser was incorporated;

(c)     a certificate of the secretary of Purchaser, dated as of the Closing Date, in form and substance reasonably satisfactory to Seller, as to (A) there having been no amendments to the certificate of formation of Purchaser since the date of the certified copy delivered pursuant to Section 4.3(a); (B) Purchaser's authorization to execute and deliver, and perform its obligations under, this Agreement and the Transaction Documents to which

13

Purchaser is a party; and (C) the name, office, and signatures of the officers of Purchaser executing this Agreement and the Transaction Documents;

(d)    the Assignment and Assumption Agreement, duly executed by Purchaser;

(e)    each Transaction Document to which Purchaser is a party, duly executed by Purchaser;

(f)    the certificates of Purchaser to be received by Seller pursuant to Sections 9.2(a) and (b); and

(g)    such other assignments and other good and sufficient instruments of assumption and transfer, in form reasonably satisfactory to Seller, as Seller may reasonably request to transfer and assign the Assumed Liabilities to Purchaser.

4.4    Seller's Deliveries.  At the Closing, Seller shall deliver to Purchaser:

(a)    the Deed, Bill of Sale and each other Transaction Document to which Seller is a party, duly executed by Seller;

(b)    assignments of the Trademarks, duly executed by Seller, in form for recordation with the appropriate Governmental Authorities, substantially in the form of **Exhibit E** attached hereto;

(c)    a certified copy of the Sale Order;

(d)    the certificates of Seller to be received by Purchaser pursuant to Sections 9.1(a) and (b);

(e)    a certificate executed by Seller that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(f)    such other instruments of conveyance and transfer, in form reasonably satisfactory to Purchaser, as Purchaser may reasonably request to vest in Purchaser all the right, title, and interest of Seller in, to, or under any of the Purchased Assets, including certificates of title to all Vehicles; and

(g)    such ordinary and customary documents (including any factually accurate affidavits) as may be required to enable Purchaser to acquire, at Purchaser's sole cost and expense, one or more owner policies of title insurance issued by the Title Company covering any or all of the Real Property in form and substance reasonably acceptable to Seller.

14

# ARTICLE 5

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Purchaser as follows:

5.1    <u>Organization and Good Standing</u>.  Seller is a South Carolina limited liability company.  Seller has the requisite power and authority to own and use its properties and assets and to carry on its business as now conducted.  Seller is duly qualified to do business in each jurisdiction where the character of its business or the nature of its properties and assets makes such qualification necessary, except for any failure to be so qualified which would not, individually or in the aggregate, have a Material Adverse Effect.

5.2    <u>Authority; Validity</u>.    Subject to Bankruptcy Court approval, Seller has the requisite power and authority to enter into and perform its obligations under this Agreement and the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.    Subject to Bankruptcy Court approval, the execution, delivery, and performance of this Agreement and the Transaction Documents to which it is a party have been duly and validly authorized by all requisite action.  This Agreement has been duly and validly executed and delivered by Seller and each Transaction Document required to be executed and delivered by Seller at the Closing will be duly and validly executed and delivered by Seller at the Closing.  Subject to Bankruptcy Court approval, this Agreement constitutes, and upon execution and delivery, each Transaction Document required to be executed and delivered by Seller at the Closing will be, the legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their terms, except as such enforceability is limited by general principles of equity.

5.3    <u>Consents</u>.  Seller is not required to give any notice to, make any filing with, or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the Transaction Documents or the consummation and performance of the transactions contemplated hereby and thereby except (a) for the approval of the Bankruptcy Court, and any notices, filings, and consents required in connection with the Bankruptcy Case, including, without limitation, the entry of the Sale Order, (b) as set forth on <u>Schedule 5.3</u> attached hereto, and (c) for the 90-day Right of First Offer outlined in Seller's Membership Plan, which notice and consent will be obtained through the sale process in Seller's Bankruptcy Case.

5.4    <u>No Conflict</u>.  The execution and delivery of this Agreement and the Transaction Documents by Seller and the consummation of the transactions contemplated hereby and thereby will not breach of any of the terms of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Seller under (a) the Articles of Organization of Seller, (b) the Operating Agreement of Seller, or (c) any Order applicable to Seller.

5.5    <u>Title</u>.  Subject to the terms of the Sale Order and <u>Section 2.5</u>, Seller will transfer good title to, or, in the case of any assets leased or licensed by Seller, a valid leasehold or licensed interest in, all of the Purchased Assets, free and clear of all Encumbrances except for the Permitted Encumbrances.

5.6    Assigned Contracts.  Each of the Assigned Contracts is in full force and effect and is a valid and binding obligation of Seller and, to Seller's Knowledge, the other parties thereto, enforceable in accordance with its terms and conditions, in each case except (a) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, or (b) as would not, individually or in the aggregate, have a Material Adverse Effect. Upon entry of the Sale Order and payment of the Cure Amounts, the Assigned Contracts may be transferred from Seller to Purchaser.

5.7    Real Property.

(a)    Seller does not own any real property other than the Real Property.

(b)    Seller does not lease any interest in the Real Property to or from any Person.

(c)    Except as set forth on Schedule 5.7(c), Seller has not received written notice of, and, to Seller's Knowledge, there is no threatened (i) condemnation, eminent domain, expropriation, or similar Proceeding affecting the Real Property, (ii) proceeding to change the zoning classification of any portion of the Real Property, or (iii) imposition of any special assessments affecting the Real Property, which would, individually or in the aggregate, have a Material Adverse Effect.

5.8    Environmental Matters.  Except as set forth on Schedule 5.8 attached hereto, or as would not, individually or in the aggregate, have a Material Adverse Effect:

(a)    the current operations of the Business comply in all material respects with all Laws concerning environmental, health, or safety matters ("Environmental Laws"), and Seller has not received written notice alleging that the activities of the Business violate any Environmental Laws;

(b)    to Seller's Knowledge, there are no underground storage tanks at, on or under the Real Property and there has been no Release of any Hazardous Substances that requires reporting under applicable Environmental Laws at, on, or under the Real Property, and the Real Property has not been used by Seller, or to Seller' Knowledge, by any other Person, as a landfill or storage, treatment, or disposal site for any Hazardous Substance or non-hazardous solid wastes as defined under the Resource Conservation and Recovery Act of 1976, as amended;

(c)    neither the Facilities nor any aspect of the Business is subject to any Order with or from any Governmental Authority under any Environmental Law;

(d)    all Permits required to be obtained or filed by Seller under any Environmental Law in connection with the Purchased Assets as normally operated prior to Closing have been duly obtained or filed; and

16

(e)     Seller has made available or provided Purchaser with copies of all material documents, records, and information in Seller's possession concerning the environmental condition of the Real Property.

5.9     <u>Taxes</u>.

(a)     Seller has timely filed all material Tax Returns required to be filed in accordance with the Internal Revenue Code in all jurisdictions in which such Tax Returns are required to be filed (subject to any filing extension).

(b)     There is no pending, or, to Seller's Knowledge, threatened, audit or examination of any of Seller's Tax Returns.  No claim has been made in writing by any Governmental Authority in a jurisdiction where Seller does not file Tax Returns to the effect that such filings may be required with respect to the Business by that jurisdiction.

5.10     <u>Employment Matters</u>.

(a)     <u>Schedule 5.10</u> attached hereto contains a list of all of the Employees as of the date hereof.

(b)     There are no collective bargaining agreements to which Seller is a party relating to any of Seller's employees.  To Seller's Knowledge, there is no pending application for certification of a collective bargaining agent involving any of Seller's employees.

5.11     <u>Employee Benefits</u>.  <u>Schedule 5.11</u> attached hereto contains a list of each (i) deferred compensation plan, (ii) incentive compensation plan, (iii) equity compensation plan, (iv) "welfare" plan, fund, or program (within the meaning of Section 3(1) of ERISA), (v) "pension" plan, fund, or program (within the meaning of Section 3(2) of ERISA) (vi) "employee benefit plan" (within the meaning of Section 3(3) of ERISA), (vii) employment (other than offer letters entered into in the ordinary course of the Business), termination, severance, or "change in control" agreement, and (viii) other employee benefit plan, fund, program, agreement, or arrangement, in each case, that is sponsored, maintained, or contributed to or required to be contributed to by Seller, whether or not incorporated, that together with Seller would be deemed a "single employer" within the meaning of Section 4001(b) of ERISA (an "ERISA Affiliate"), or to which Seller or any ERISA Affiliate is party, for the benefit of any of Sellers' Employees (each such plan, whether or not material, is referred to herein as a "Benefit Plan").

5.12     <u>Seller's Intellectual Property</u>.

(a)     <u>Schedule 1(d)</u> sets forth a true and complete list of all pending applications for trademarks owned by Seller and used in the Business.

(b)     Except as disclosed on <u>Schedule 5.12(b)</u>, and except as would not, individually or in the aggregate, have a Material Adverse Effect, to Seller's Knowledge, (i) the Business as currently conducted by Seller does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against

Seller, and (ii) to Sellers' knowledge, no Person is infringing or otherwise violating any of the Trademarks.

(c)    Except as disclosed on Schedule 5.12(c), to Seller's Knowledge, the Purchased Assets and any rights provided to Purchaser pursuant to the Transaction Documents include all material third party intellectual property rights required to operate the Facilities and the Business as currently conducted by Seller.

5.13    Proceedings.  Except for the Bankruptcy Case and as set forth on Schedule 5.13 attached hereto, there is no Proceeding or Order pending, outstanding, or, to Seller' Knowledge, threatened, against Seller that seeks to restrain or prohibit or otherwise challenge the consummation, legality, or validity of the transactions contemplated hereby or that would have, if determined adversely to Seller's interests, individually or in the aggregate, a Material Adverse Effect.

5.14    Compliance with Laws.  Except as set forth in Schedule 5.8 and Schedule 5.14 attached hereto, and except as would not, individually or in the aggregate, have a Material Adverse Effect, Seller is not in violation of any Law applicable to the operation of the Business and holds all Permits required for Seller to conduct the Business as currently conducted.

5.15    Brokers or Finders.  Neither Seller nor any Person acting on behalf of Seller has used the services of any broker, finder, investment banker, agent, or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Seller shall hold harmless and indemnify Purchaser from any claims with respect to any such fees or commissions.

## ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser represents and warrants to Seller as follows:

6.1    Organization.  Purchaser is a limited liability company, duly organized, validly existing, and in good standing under the laws of the State of Delaware.  Purchaser has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2    Authority; Validity.  Purchaser has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby.  The execution, delivery, and performance of this Agreement by Purchaser and the consummation by Purchaser of the transactions contemplated hereby have been duly and validly authorized by all requisite corporate actions in respect thereof.  This Agreement has been duly and validly executed and delivered by Purchaser and each Transaction Document to which Purchaser is a party will be duly and validly executed and delivered by Purchaser at the Closing.  This Agreement and the other Transaction Documents to which Purchaser is a party constitute the legal, valid, and binding obligation of Purchaser, enforceable against Purchaser in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy,

insolvency, reorganization, moratorium, or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity.

6.3 <u>Consents</u>. Purchaser is not required to give any notice to, make any filing with, or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

6.4 <u>No Conflict</u>. The execution and delivery of this Agreement and the Transaction Documents by Purchaser and the consummation of the transactions contemplated hereby and thereby will not breach of any of the terms of, or constitute a default under, or conflict with, or cause any acceleration of any obligation of Purchaser under (a) the governing documents of Purchaser; (b) any contract or agreement with respect to which Purchaser is a party or otherwise bound, (c) any Order applicable to Purchaser, or (d) any Law.

6.5 <u>Availability of Funds</u>. Purchaser has sufficient cash in immediately available funds to pay the Deposit and the Cash Consideration and all costs, fees, and expenses to be paid by Purchaser that are necessary to consummate the transactions contemplated by this Agreement and the Transaction Documents.

6.6 <u>Litigation</u>. There are no Proceedings pending or, to the knowledge of Purchaser, threatened, that would affect Purchaser's ability to perform its obligations under this Agreement or any Transaction Documents or to consummate the transactions contemplated hereby or thereby.

6.7 <u>Brokers or Finders</u>. Neither Purchaser nor any Person acting on behalf of Purchaser has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent, or intermediary for or on account of the transactions contemplated by this Agreement for which Seller is or will become liable, and Purchaser shall hold harmless and indemnify Seller from any claims with respect to any such fees or commissions.

6.8 <u>Assigned Contracts</u>. Purchaser is and will be capable of satisfying the conditions contained in Section 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts and shall, consistent with <u>Section 7.4</u>, cooperate with Seller to provide proof of such capability as is necessary to satisfy counterparties to such Assigned Contracts or to satisfy the Bankruptcy Court.

6.9 <u>Employees</u>. It is Purchaser's present intention to hire all Employees as of the Closing Date on the same terms as their current employment with Seller.

# ARTICLE 7

## ACTION PRIOR TO THE CLOSING DATE

7.1 <u>Due Diligence</u>.

(a) During the period from the Effective Date until 11:59 p.m. (New York, New York time) on the tenth (10th) day after Purchaser's receipt of the Phase 1 environmental study it has ordered for the Real Property, but no later than March 31, 2015 (the "Due Diligence Period"), Seller shall, in accordance with reasonable procedures to be established in good faith by mutual agreement of Seller and Purchaser, (a) afford Purchaser's Representatives access during normal business hours to the offices, properties, key employees, outside accountants, agreements, and other documentation and financial records with respect to the Business, the Purchased Assets, and the Assumed Liabilities to the extent Purchaser reasonably deems necessary, and permit Purchaser and its Representatives to make copies of such materials, and (b) furnish to Purchaser or its Representatives such additional information concerning the Purchased Assets, the Business, and the Assumed Liabilities as shall be reasonably requested by Purchaser or its Representatives; provided that Purchaser shall submit to Seller requests for such access, information, or cooperation, including reasonable detail regarding the requested access, information, or cooperation, a reasonable period in advance of the time at which such access, information, or cooperation is to be provided. Notwithstanding anything herein to the contrary, no such access, information, or cooperation shall be permitted or required to the extent that it would require Seller to disclose information subject to attorney-client privilege.

(b) Purchaser and its Representatives shall have access to the Real Property at all times subsequent to the Effective Date and prior to the Closing or earlier termination of this Agreement with full right to: (i) inspect the Real Property; and (ii) to conduct tests and other due diligence activities thereon, including, but not limited to, soil tests (including borings) and hazardous waste studies, and to make such other examinations with respect thereto as Buyer may deem reasonably necessary. Any test, examination or inspection of the Real Property by Purchaser or its Representatives and all costs and expenses in connection with Purchaser's inspection of the Real Property shall be at the sole cost and expense of Purchaser and shall be performed in a manner not to unreasonably interfere with Seller's ownership of the Real Property. Purchaser agrees to satisfy or cause the release promptly of any mechanics' liens against the Real Property which arise by reason of Purchaser's due diligence actions. Purchaser covenants, warrants and agrees to restore and correct any damage to the Real Property caused by Purchaser or its Representatives.

(c) Purchaser shall defend, indemnify and hold Seller harmless from and against any and all claims, demands, losses, expenses (including reasonable attorneys' fees), damages, costs and liabilities, suffered or incurred by Seller as a result of any physical damage to any of Seller's assets or any death or personal injury to any person caused by or attributable to the acts or omissions of Purchaser or its Representatives arising in connection with inspections, surveys or studies performed by or on behalf of Purchaser; provided, however, that (1) this obligation to indemnify, defend and hold harmless shall not apply to the extent any such claim, demand, loss, expense, damage, cost or liability arises or results in whole or in part from or otherwise in connection with any act or omission of Seller, or Seller's agents, employees,

architects, engineers, surveyors, consultants, contractors, subcontractors or other Seller Representatives, and (2) Purchaser shall have no liability to Seller or to any other Person by reason of, nor shall Purchaser have any duty to indemnify, defend or hold Seller or any other Person harmless from or against, any claim, demand, loss, expense, damage, cost or liability, including, without  limitation, any claim for diminution in value of the Real Property or for environmental remediation  or clean-up costs, arising out of or otherwise in connection with the fact of having discovered and/or reported (as may be required by law) any adverse physical or environmental condition, title condition or other defect with respect to the Real Property. Further, this obligation to indemnify, defend and hold harmless shall not extend to, and Seller hereby releases Purchaser from any liability for, any claims, losses, costs, damages or expenses arising or resulting in whole or in part from, or in connection with or otherwise related to  any existing environmental contamination at, on or under the Real Property, or other deficiencies in the Real Property, that may be discovered by Purchaser as a result of its investigations or inspections, or  any disclosure of such matters by Purchaser or its Representatives to a governmental agency that may be required by applicable law. The obligations of Purchaser set forth in this Section 7.1(b) shall survive the termination of this Agreement or the Closing.

      7.2    Title Matters.

      (a)    Within thirty (30) days after the Effective Date, Purchaser shall obtain, at its sole cost and expense, a commitment, for an owner's policy of title insurance (the "Title Commitment") applicable to the Real Property dated no earlier than the Effective Date from the Title Company.

      (b)    Purchaser shall review the Title Commitment within ten (10) days after receipt thereof and notify Seller within such ten (10) day period of its objections, if any, to any matters as to which exceptions are taken in the Title Commitment which materially and adversely affect title to the Real Property and do not constitute Permitted Encumbrances (the "Unpermitted Encumbrance"). Any Unpermitted Encumbrances shall be removed from the Real Property pursuant to the Sale Order, or, if not removed by the Sale Order, Purchaser may elect to (i) accept title to the Real Property subject to any Unpermitted Encumbrance not removed by the Sale Order, or (ii) terminate this Agreement and receive the refund of its Deposit.

      (c)    Purchaser may, at its own expense, contract to have a new or updated survey of the Real Property, with the legal description of the Real Property used in the Deed and other conveyance documents, to refer to such new or updated survey if so requested by Purchaser.

      (d)    The Title Commitment may be updated by endorsement by the Title Company at the request of Purchaser through the Closing Date and prior to the recording of the Deed, and should the Title Company take exception to any additional matter first appearing of record after the date of the Title Commitment (or any prior update endorsement of the Title Commitment that may have been provided) that constitutes a Unpermitted Encumbrance, Purchaser shall have the same rights which exist under Section 7.2(b) above as if the date of such title endorsement equated to the date the original Title Commitment was received.

(e)    Notwithstanding the foregoing, Seller shall be obligated to cure or otherwise remove, on or before Closing, all (A) mortgage or deed of trust liens, deeds to secure debt or security interests against the Real Property, (B) real estate tax liens against the Real Property, other than liens for taxes and assessments not yet due and payable or due and payable for the current year of Closing which will be prorated as provided herein, (C) Encumbrances that have been voluntarily placed against the Real Property by Seller after the Effective Date of this Agreement and that are not otherwise permitted pursuant to the provisions hereof, (D) mechanics' liens against the Real Property arising from the acts or omissions of Seller, and (E) any other Liens (defined below) against the Real Property that, in the case of (E) only, can be remedied by the payment of money (the items contained in (A), (B), (C), (D) and (E)) being "Required Removal Exceptions"). Seller shall be entitled to apply the Purchase Price towards the payment or satisfaction of the Required Removal Exceptions, failing which Purchaser shall have the right, but not the obligation, to cure any such Required Removal Exceptions, by instructing the Title Company to pay at Closing such part of the Purchase Price to the holders of such Required Removal Exceptions as is necessary to remove such Required Removal Exceptions and to obtain from the holders of such Required Removal Exceptions any recordable releases or terminations required by the Title Company to remove those Required Removal Exceptions as exceptions to the Purchaser's Title Commitment or policy to be issued pursuant thereto. For purposes of this Agreement, "Lien" shall mean all liens, pledges, charges, security interests, encumbrances, title retention agreements, adverse claims or restrictions or judgments affecting the Real Property, which, in each case, have been granted or arisen by law to secure an obligation of Seller to pay money.

7.3    Termination Right During Due Diligence Period.    Anything to the contrary contained in this Agreement notwithstanding, if, Purchaser in its sole and absolute discretion determines that the Purchased Assets are not acceptable or otherwise chooses not to proceed with the purchase hereunder during the Due Diligence Period for any reason whatsoever or for no reason at all, Purchaser shall have the right to terminate this Agreement by delivering written notice of termination of this Agreement to Seller at any time before the end of the Due Diligence Period, in which event this Agreement shall be of no further force and effect and the Deposit shall be promptly returned to Purchaser.

7.4    Operations Prior to the Closing Date.    From and after the date hereof through the Closing, except as expressly contemplated by this Agreement, authorized by the Bankruptcy Court, or as disclosed in Schedule 7.4 attached hereto, unless otherwise required by Law or permitted with the prior written consent of Purchaser (which consent shall not be unreasonably withheld or delayed):

(a)    Seller shall, subject to Seller's obligations and duties as a debtor-in-possession and except as may be necessary or required in connection with the Bankruptcy Case, use reasonable efforts to comply in all material respects with all Laws with respect to the conduct of the Business and maintain in full force and effect all Permits.

(b)    Seller shall not:

(i)    other than the disposition of Inventory and other minor assets in the ordinary course of business, and other than the incurrence of Encumbrances

pursuant to any debtor-in-possession financing of Seller or order of the Bankruptcy Court authorizing Seller's use of cash collateral, sell, lease (as lessor), transfer, or otherwise dispose of any of its assets or mortgage, pledge, voluntarily impose or suffer to be imposed, any Encumbrance on any of the Purchased Assets;

(ii) amend any of the Assigned Contracts other than non-material amendments made in the ordinary course of business; or

(iii) enter into any agreement or commit to take any action prohibited by this Section 7.4.

7.5    Reasonable Efforts.

(a)    Seller and Purchaser shall use their reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper, or advisable to consummate, in the most expeditious manner practicable, the transactions contemplated hereby, including, without limitation, using reasonable efforts to:  (i) cause the conditions precedent set forth in Article 9 to be satisfied, (ii) to obtain, at the earliest practicable date, all necessary Governmental Authorizations and make all necessary registrations, declarations, and filings, and (iii) obtain Bankruptcy Court approval of the Bid Procedures Order and, if Purchaser is the successful bidder for the Purchased Assets, the Sale Order.  Nothing herein shall preclude Seller from pursuing Alternative Transactions.

(b)    Seller and Purchaser (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification, or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto.  Unless otherwise required by Law, neither Seller nor Purchaser shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation, or other inquiry with respect to this Agreement or the transactions contemplated hereby without consulting with the other party in advance and, to the extent permitted by any such Governmental Authority, giving the other party the opportunity to attend and participate in such meeting, in each case to the maximum extent practicable.  Subject to any restrictions under applicable Laws, each of Purchaser and Seller shall furnish the other with copies of all correspondence, filings, and communications between it and its respective Representatives and the Governmental Authority or members of its staff with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business), or any such filing, notification, or request for approval.  Each party hereto shall furnish the other with such necessary information and assistance as such other party may reasonably request in connection with their preparation of necessary filings, registration, or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

7.6    Bankruptcy Court Approval.    Seller and Purchaser acknowledge that this Agreement and the consummation of the transactions contemplated hereby are subject to Bankruptcy Court approval.  Seller and Purchaser acknowledge that (i) to obtain such approval, Seller must demonstrate that it has taken reasonable steps to obtain the highest and otherwise best offer possible for the Purchased Assets, and that such demonstration shall include giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, and, if necessary, conducting an auction, and (ii) Purchaser must provide adequate assurance of future performance within the meaning of Section 365(f)(2)(B) of the Bankruptcy Code with respect to the Assigned Contracts.  Purchaser agrees that it will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been a proper demonstration of adequate assurance of future performance under the Assigned Contracts, such as furnishing timely requested documents or information for filing with the Bankruptcy Court and making Purchaser's Representatives available to testify before the Bankruptcy Court.

7.7    Sale Order.  Seller will use its reasonable efforts to consummate the transactions contemplated hereby by seeking, with one or more appropriate motion or motions and the entry of appropriate Orders of the Bankruptcy Court (all such motions and proposed Orders being in form and substance reasonably satisfactory to Purchaser), including an Order approving this Agreement and (a) the sale of the Purchased Assets to Purchaser free and clear of all Encumbrances, other than any Permitted Encumbrances, and (b) the assumption of the Assumed Liabilities, pursuant to Section 363(b), (f), (1), and (m) and Section 365 of the Bankruptcy Code (the "Sale Order").

7.8    Response to Offers.  Purchaser acknowledges and agrees that, subject to the terms of the Bid Procedures Order, Seller will have the responsibility and obligation to respond to any inquiries or offers to acquire the Purchased Assets and to perform any and all other acts related thereto which are required under the Bankruptcy Code or other applicable Law, including without limitation, supplying information relating to the Purchased Assets to any prospective purchasers.

7.9    Notice of Developments.  Seller shall give prompt written notice to Purchaser upon obtaining Seller's Knowledge (i) of any development constituting a Material Adverse Effect, (ii) that any representation or warranty made by Seller herein was untrue or inaccurate as of the date hereof, (iii) of any matter or event first arising or occurring after the date hereof that, if existing or occurring on or before the date hereof, would have been required to be set forth, disclosed, or described in the schedules to this Agreement in order for any representation or warranty made by Seller herein to be true and correct, (iv) of any development materially and adversely affecting the ability of any Seller to consummate the transactions contemplated by this Agreement, and (v) of any written notice or other written communication from any Governmental Authority in connection with the transactions contemplated by this Agreement. Seller shall have the right, from time to time prior to the Closing, to amend or supplement the schedules to this Agreement with respect to any matter described in clause (iii) above.    No disclosure pursuant to this Section 7.9 and no amendment or supplement of the schedules to this Agreement pursuant to the preceding sentence shall be deemed to prevent or cure any misrepresentation, breach of warranty, or breach of covenant, or to otherwise affect or diminish any representation, warranty, covenant, or obligation of Seller in this Agreement, for purposes of

determining whether any condition set forth in <u>Section 9.1</u> has been satisfied. This <u>Section 7.9</u> shall not constitute a covenant or agreement for purposes of <u>Section 9.1(b)</u>.

7.10    <u>Communications with Suppliers</u>. As soon as reasonably practicable after the date hereof, Seller will use its reasonable efforts to arrange for meetings or discussions between Representatives of Purchaser and any significant vendors of the Business reasonably designated by Purchaser. Other than with the prior consent of Seller, Purchaser shall not, and shall cause its Representatives not to, contact, engage in any discussions, or otherwise communicate with, any of Seller's suppliers, and other Persons with which Seller has a business relationship or other commercial dealings where the subject matter thereof relates to Seller, the Purchased Assets, the Business, this Agreement, or the transactions contemplated by this Agreement unless Seller or its Representatives are present (it being understood that contacts, discussions, and communications with such Persons in the ordinary course of Purchaser's existing business shall not be restricted by this <u>Section 7.10</u>).

7.11    <u>Casualty and Condemnation</u>. If, prior to the Closing, all or any material portion of the Facilities or any material portion of the Purchased Assets is destroyed by fire or other casualty, is taken in condemnation or under the right of eminent domain, or Proceedings for such purposes are pending, Purchaser may elect to:

(a) terminate this Agreement, whereupon no party shall have any further obligation to any other hereunder; provided, however, that Purchaser shall not be entitled to exercise this option unless Restoration Costs exceed $1,000,000.00; or

(b) purchase the Purchased Assets notwithstanding any such destruction, taking, or pending taking, and reduce the consideration payable by Purchaser hereunder in an amount equal to the Restoration Costs.

Seller shall be entitled to retain all insurance proceeds, awards, and other amounts paid or payable to Seller by any insurance company, Governmental Authority, or other Person by reason of the destruction or taking of the affected Purchased Assets.

7.12    <u>New Club</u>.

(a)    Purchaser intends to form and operate a golf club utilizing the Purchased Assets (the "New Club").

(b)    Membership in the New Club will be offered to:

(i)    Active members of Seller's Golf Club at Briar's Creek ("Old Club"); and

(ii)    Resigned members of the Old Club who are in good standing. A resigned member will be deemed in good standing only if such member at and after the time of resignation satisfied all of its financial obligations to the Old Club. For the avoidance of doubt, a member who did not satisfy all Old Club obligations when due may not cure such past due obligations and thereby be deemed in good standing.

(c)     Within twenty (20) days after the Effective Date of this Agreement, Purchaser shall provide Seller a copy of the Membership Plan for the New Club and Seller shall promptly provide a copy thereof to the members of the Old Club.

(d)     The initial capitalization of Purchaser, which shall be contributed at Closing, shall include no less than Two Million Dollars ($2,000,000) in cash, which shall be held for the New Club's operational and capital needs.

# ARTICLE 8

## ADDITIONAL CLOSING MATTERS

8.1     Taxes.

(a)     Any sales Tax, use Tax, or similar Tax attributable to the sale or transfer of the Purchased Assets and not exempted under applicable Law ("Sales Taxes") and any real estate transfer Tax attributable to the sale or transfer of the Purchased Assets and not exempted under applicable Law ("Transfer Taxes") shall be borne by Purchaser.  Seller and Purchaser shall use reasonable efforts and cooperate to exempt the sale and transfer of the Purchased Assets from any Sales Taxes and Transfer Taxes, and Purchaser shall provide Seller with any exemption certificates, resale certificates, or similar certificates that may be applicable to Purchaser.

(b)     Purchaser shall be liable for the payment of any and all real and personal property Taxes with respect to the Purchased Assets for any Tax period during which the Closing falls and shall be entitled to a credit against the Cash Consideration for the portion of such Taxes accruing prior to the Closing, which shall be prorated using the amount of the property Tax assessment for such Purchased Asset for such Tax period, if available, or if otherwise, based on the property Taxes paid with respect to such Purchased Asset during the preceding Tax year.  With respect to any Taxes that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Purchaser shall either pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing or, at Purchaser's option, to the Title Company at the Closing, for further payment by it to the applicable Governmental Authority, and Purchaser shall be given credit against the Cash Consideration due at Closing.

(c)     Purchaser and Seller agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Purchased Assets (including access to books and records and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, and the prosecution or defense of any claims, suit or proceeding relating to any Tax; provided, however, that neither Purchaser nor Seller shall be required to disclose the contents of its income Tax Returns to any Person.  Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(c) shall be borne by the party requesting it.

8.2     <u>Adjustments and Prorations</u>.  The revenues and expenses of the Purchased Assets shall be apportioned between Seller and Purchaser or, where applicable, credited in total to a particular party as of the Closing Date, to the extent that the same cannot be separated as of the Closing Date.  In connection therewith, Seller and Purchaser shall jointly prepare a Preliminary Statement in accordance with <u>Section 3.3(a)</u>, which shall show the net amount due to Seller or Purchaser, as the case may be, as a result of the adjustments and prorations set forth herein.  For purposes of the Closing, Seller and Purchaser shall be entitled to rely upon the information set forth in the Preliminary Statement.  As soon as practicable after the Closing Date, but in no event later than the date which is sixty (60) days after the Closing Date, Seller and Purchaser shall jointly prepare a final closing statement ("Final Statement") and reconcile any differences between the Preliminary Statement and the Final Statement.  Notwithstanding the period for preparation of the Final Statement, subject to the Reserve established in <u>Section 8.2(n)</u> below, Seller shall be entitled to immediately use and disburse the funds (less the Reserve) it receives at Closing from the Purchase Price as authorized by the Bankruptcy Court.

(a)     <u>Special Assessments and Other Taxes</u>.  Certified, confirmed and ratified special assessment liens imposed by public bodies prior to the Effective Date shall be the obligation of the Purchaser. Seller shall be responsible for all sales taxes, withholding taxes, South Carolina lease taxes, intangible taxes, and other taxes and assessments related to the Facilities arising prior to the Closing Date.  A list of all outstanding special assessments related to the Facilities is more particularly described in <u>Exhibit 6.2(a).</u>

(b)     <u>Telephone Numbers and Fax Numbers</u>.  Purchaser agrees to assume title to, payment for, and responsibility of the telephone numbers and fax numbers related to the Facilities as of the Closing Date.

(c)     <u>Utility Charges</u>.  Utility charges for telephone, gas, electricity, sewer, water, and other services shall not be prorated to the extent that Seller can make arrangements for the rendering of final bills based on meter readings as of the Closing Date.  Seller shall be responsible for the payment as of the Closing Date of all bills for utility charges up to and including the Closing Date.  To the extent that utility bills cannot be rendered as of the Closing Date, such charges for the period through the Closing Date shall be prorated as of the Closing Date based upon the most recent available bills and readjusted on the basis of the actual bills as and when received.  Upon such readjustment, the utility charges payable by Seller and not paid by the Closing Date shall be promptly paid by Seller.  Any utility deposits shall be transferred to Purchaser and credited to Seller as of the Closing Date.

(d)     <u>Operating Expenses and Trade Payables</u>.  Seller shall be responsible for all liabilities, obligations, operating expenses and Trade Payables related to the Facilities incurred by Seller (including all charges and fees payable, if any, under the Assigned Contracts and all amounts, if any, payable to third-party contractors and other parties for any additions, alterations or improvements to the Purchased Assets undertaken before the Closing Date) up to the Closing Date.  To the extent the amounts of such items for which Seller is responsible are then known, Seller shall pay such Payables as of the Closing Date, and escrow in a manner mutually acceptable to Seller and Purchaser funds sufficient to pay in full all other Payables, which if the same were not paid, would create a lien on the Facilities or would materially and adversely affect Purchaser's ability to operate the Facilities as they are currently being operated.

Seller shall pay all other Payables in due course.  All liabilities, obligations, operating expenses and trade accounts accruing after the Closing Date ("Post-Closing Expenses") that are not the responsibility of Seller as otherwise provided under this Agreement shall be the responsibility of Purchaser.

(e)    Intentionally Blank.

(f)    Security Deposits; Gift Certificates.  Any sums received by Seller on or after the Petition Date as a security deposit, if any, due to the depositor for the rental, use of or any services relating to the Facilities (or any portion thereof), including, without limitation, prepaid and unearned tee time, outing, locker or storage fees, and other deposits for periods after the Closing Date (the "Security Deposits"), shall be paid over and assigned to Purchaser on the Closing Date.  As between Purchaser and Seller, Purchaser shall assume (i) all obligations of Seller with respect to such Security Deposits actually assigned over to and paid to Purchaser on the Closing Date; and (ii) Seller's obligations related to gift certificates for future use of the Facilities or food and beverage service at the Facilities.

(g)    Prepaid Expenses and Utilities Security Deposits.    All expenses (including permit and inspection fees, license fees, and regulatory fees) prepaid for periods after the Closing Date, and all utilities security and other deposits paid by Seller to third parties for which the right to the return of any such sums is transferred to Purchaser as of the Closing Date (without any offsetting claim or liability) shall be credited to Seller as of the Closing Date.

(h)    Cash.  All cash on hand in house banks (including any petty cash fund) on the morning of the Closing Date shall not constitute Purchased Assets but, if Seller and Purchaser so elect in writing, it shall become the property of Purchaser and the amount thereof shall be credited to Seller at the Closing.

(i)    Accounts Receivable.  All those accounts receivable which were accrued and earned in connection with the operation of the Facilities prior to the Closing Date (hereinafter "Accounts Receivable") shall be deemed the property of Seller and the right to collect the Accounts Receivable retained by Seller. As of the Closing Date, the Seller shall deliver to Purchaser a detailed list of all of the Accounts Receivable.  If the actual amount of Accounts Receivable is not known on the Closing Date, the list shall be based on the Accounts Receivable in existence on the most recent date prior to the Closing Date that the Accounts Receivable may be practicably determined, and the list updated after the Closing.  Irrespective of Seller's ownership of the Accounts Receivable, for ninety (90) days after the Closing, Purchaser shall provide appropriate notices as to the Accounts Receivable to the parties who are obligated therefore.  As funds are received by Purchaser from any such parties, Purchaser shall remit to Seller within ten (10) days after the end of each calendar month amounts due to Seller for goods and services provided before the Closing Date.  At the end of ninety (90) days after the Closing, unless otherwise agreed by Purchaser and Seller, Purchaser shall have no further obligation with respect to the Receivables and Seller shall be solely responsible for all further collection activities related thereto; provided, however, that should any payments expressly designated as a payment related to the Accounts Receivable be received by Purchaser after the ninety (90) day collection period, such amount shall be promptly remitted to Seller.

(j)      Member Dues.  All pre-paid dues shall be pro-rated as of the Closing Date.

(k)      Staff.  Seller shall be responsible for all wages and fringe benefits including, but not limited to, accrued vacation pay, sick pay and payroll taxes, and any employee incentive bonus programs, pro-rated through the Closing Date.  Purchaser shall not assume any obligations of Seller to any Employees, including any obligations under any Benefit Plan except as set forth on Schedule 8.2(k).

(l)      Basis for Prorations.  All prorations shall be made on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and based upon the actual number of days in the month and a three hundred sixty five (365) day year. Purchaser and Seller shall cause their respective representatives to make such inventories, examinations and audits of the Purchased Assets, and of the books and records of the Business, as the parties may deem necessary to make the adjustments and prorations required under this Article. Based upon such audits and inventories, the Seller will prepare (with the assistance and cooperation of Purchaser) and deliver on or before the Closing Date, the Preliminary Statement setting forth the foregoing prorations and adjustments.  The Preliminary Statement shall contain Purchaser's and Seller's best good faith estimates of the amounts of the items requiring prorations and adjustments pursuant to this Section 8.2.  Purchaser and Seller shall have the right to approve the Preliminary Statement, which approval shall not be unreasonably withheld or delayed.  The amount set forth on the Preliminary Statement shall be the basis upon which the prorations and adjustments provided for herein shall be made on the Closing Date.  The net proration amount shown on the Preliminary Statement shall be paid, in cash, by Seller or Purchaser, as the case may be, to the other on the Closing Date.

(m)      Time Period for Completion of Final Statement. Within sixty (60) days following the Closing Date, Purchaser and Seller will cooperate in preparing the Final Statement setting forth the final determination of all the items of the Closing Statement.  In the event that, at any time within the said sixty (60) day period, either party discovers any items that should have been included on the Preliminary Statement but were omitted therefrom, such items shall be adjusted in the same manner as if their existence had been known at the time of the preparation of the Preliminary Statement.

(n)      Reserve to Fund Adjusted Amounts in Final Statement.  In order to enable Seller to use and make payments from the Purchase Price prior to the close of the period allowed for the completion of the Final Statement (pursuant to a confirmed Chapter 11 plan or as may be otherwise authorized by the Bankruptcy Court), at Closing a portion of the cash due to Seller shall be reserved and held by Purchaser's attorney (the "Reserve") for the adjustments to be made pursuant to the Final Statement and this Section 8.2, and Seller may use the balance of funds (less the Reserve) it receives at Closing immediately upon Closing.  The Reserve shall be in the amount of $50,000.00.

(o)      Post-Closing Receipts. Seller and Purchaser agree that each will hold and promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements, or other property that they may receive on or after

29

the Closing which properly belongs to the other and will account to the other for all such receipts.

(p)      <u>Post-Closing Books and Records and Personnel</u>.  For five (5) years after the Closing Date (or such longer period as may be required by Law, any Governmental Authority or any ongoing Proceeding) (a) Purchaser shall not dispose of or destroy any of the business records and files received by Purchaser as Purchased Assets, (b) Purchaser shall retain either the originals or copies of the business records and files received by Purchaser as Purchased Assets onsite at the offices on the Real Property, and (c) Purchaser shall allow Seller (including, for clarity, any trust established under a Chapter 11 plan of Seller or any other successors of Seller) and any Representatives of Seller, its officers, directors, and employees reasonable access during normal business hours, upon reasonable advance notice, to all employees and files of Purchaser and any Documents included in the Purchased Assets for purposes relating to the Bankruptcy Case, the wind-down of the operations of Seller, the functions of any such trusts or successors, or other reasonable business purposes, and Seller (including any such trust or successors) and such Representatives shall have the right to make copies of any such files, books, records, and other materials.  In the event Purchaser desires to destroy any such records during or after the time during which they must be maintained pursuant to this Section, Purchaser shall first give ninety (90) days prior written notice to Seller and Seller shall have the right at its option and expense, upon prior written notice given within such ninety (90) day period to Purchaser, to take possession of the records within one hundred and eighty (180) days after the date of such notice.

8.3    <u>Liquor Licenses</u>.  Seller will cooperate in all reasonable respects (which shall include, without limitation, supplying information known to Seller and execution of such reasonable documents as may be legally required) with Purchaser in connection with Purchaser's application (the "Liquor Applications") for alcoholic beverage licenses (the "Liquor Licenses").  On or before the Closing Date, Seller shall execute such written agreements, statements and/or forms as may be reasonably required to terminate Seller's Liquor Licenses, if any.

# ARTICLE 9

## CONDITIONS PRECEDENT

9.1    <u>Conditions Precedent to Purchaser's Obligations</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

(a)      Except for any breach or inaccuracy of any representation or warranty (or the fact or circumstance to which such breach or inaccuracy relates) that does not have, and would not be reasonably expected to have, a Material Adverse Effect, the representations and warranties of Seller set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or Material Adverse Effect or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date).  Seller shall have delivered to Purchaser a certificate to such effect.

(b)        Seller shall have duly performed and complied with each covenant and agreement that Seller is required to perform or to comply with pursuant to this Agreement at or prior to the Closing in all material respects (except that those covenants and agreements that are qualified as to materiality or Material Adverse Effect or similar expressions shall have been duly performed and complied with in all respects).  Seller shall have delivered to Purchaser a certificate to such effect.

(c)        No Governmental Authority shall have enacted, issued, or entered any Order which is in effect and which has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, or which could cause any of such transactions to be rescinded following the Closing.

(d)        Each of the deliveries required to be made by Seller pursuant to Section 4.4 shall have been so delivered.

(e)        The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order.

(f)        No Material Adverse Effect shall have occurred after the date hereof and be continuing.

9.2    <u>Conditions Precedent to Seller's Obligations</u>.  Seller's obligation to consummate the transactions contemplated by this Agreement is subject to the satisfaction or waiver, at or prior to the Closing, of each of the following conditions:

(a)    The representations and warranties of Purchaser set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date), and Seller shall have received a certificate of Purchaser to such effect.

(b)    The covenants and agreements that Purchaser is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects (except that those covenants and agreements that are qualified as to materiality or similar expressions shall have been duly performed and complied with in all respects), and Seller shall have received a certificate of Purchaser to such effect.

(c)    No Governmental Authority shall have enacted, issued, or entered any Order which is in effect and which has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement, or which could cause any of such transactions to be rescinded following the Closing.

(d)    Each of the deliveries required to be made to Seller pursuant to <u>Section 4.3</u> shall have been so delivered.

(e)   The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order.


# ARTICLE 10


# TERMINATION

10.1   Events.  Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing:

(a)   By either Seller or Purchaser:

(i)   if a Governmental Authority issues a Final Order prohibiting the transactions contemplated hereby where such Order was not requested, encouraged, or supported by Seller or Purchaser;

(ii)   by mutual written consent of Seller and Purchaser;

(iii)   if the Closing shall not have occurred and an Alternative Transaction (as defined below) shall not have closed by June 30, 2015, or an extension of this date as provided in Section 4.1; provided however, that (A) Purchaser shall be permitted to terminate this Agreement pursuant to this Section 10.1(a)(iii) only if (x) Purchaser is not in material breach of any of its representations, warranties, covenants, or agreements contained herein and (y) Purchaser has provided written notice to Seller of its intention to exercise its rights under this Section 10.1(a)(iii) and Seller has not provided written notice to Purchaser that it is ready, willing, and able to close the transactions contemplated by this Agreement on or before the date that is two (2) Business Days after the date of such notice from Purchaser; and (B) Seller shall be permitted to terminate this Agreement pursuant to this Section 10.1(a)(iii) only if (x) Seller is not in material breach of any of its representations, warranties, covenants, or agreements contained herein and (y) Seller has provided written notice to Purchaser of its intention to exercise its rights under this Section 10.1(a)(iii) and Purchaser has not provided written notice to Seller that it is ready, willing, and able to close the transactions contemplated by this Agreement on or before the date that is two (2) Business Days after the date of such notice from Seller;

(iv)   if the Bankruptcy Court enters an Order dismissing the Bankruptcy Case or converting it to a case under Chapter 7 of the Bankruptcy Code where such Order was not requested, encouraged, or supported by Seller; or

(v)   if Seller enters into one or more agreements (any such agreement being a "Competing Agreement") to sell, transfer, or otherwise dispose of any material portion of the Purchased Assets in a transaction or series of transactions other than in the

32

ordinary course of business with one or more Persons other than Purchaser or a Person pursuant to a Competing Agreement (an "Alternative Transaction") that actually closes.

(b)    By Purchaser:

(i)    pursuant to Section 7.3 prior to the end of the Due Diligence Period as specified therein;

(ii)    in the event of any material breach by Seller of any of Seller's agreements, covenants, representations, or warranties contained herein (provided such breach would result in the failure of a condition set forth in Section 9.1(a) or Section 9.1(b) to be satisfied) or (if such breach is material) in the Bid Procedures Order or Sale Order, and the failure of Seller to cure such material breach within ten (10) Business Days after receipt of the Purchaser Termination Notice; provided, however, that Purchaser (A) is not in material breach of any of its representations, warranties, covenants, or agreements contained herein or in the Bid Procedures Order or the Sale Order, (B) notifies Seller in writing (the "Purchaser Termination Notice") of its intention to exercise its rights under this Section 10.1(b)(ii) as a result of the material breach, and (C) specifies in the Purchaser Termination Notice the representation, warranty, covenant, or agreement contained herein or in the Bid Procedures Order or Sale Order of which Seller is allegedly in material breach;

(iii)    if a Governmental Authority issues a Final Order prohibiting the transactions contemplated hereby where such Order was requested, encouraged, or supported by Seller; or

(iv)    if Purchaser is not the successful bidder at an auction of the Purchased Assets; provided, however, that Purchaser shall not be permitted to terminate this Agreement pursuant to this Section 10.1(b)(iv) until after the earlier of (A) the closing of an Alternative Transaction or (B) the 25th day following entry by the Bankruptcy Court of an Order authorizing and approving a Competing Agreement (such an Order, a "Competing Transaction Sale Order").

(c)    By Seller:

(i)    in the event of any breach by Purchaser of any of Purchaser's agreements, covenants, representations, or warranties contained herein (provided such breach would result in the failure of a condition set forth in Section 9.2(a) or Section 9.2(b) to be satisfied) or (if such breach is material) in the Bid Procedures Order or Sale Order, and the failure of Purchaser to cure such breach within ten (10) Business Days after receipt of the Seller Termination Notice; provided, however, that Seller (A) is not in material breach of any of its representations, warranties, covenants, or agreements contained herein or in the Bid Procedures Order or the Sale Order, (B) notifies Purchaser in writing (the "Seller Termination Notice") of its intention to exercise its rights under this Section 10.1(c)(i) as a result of the material breach, and

(C) specifies in the Seller Termination Notice the representation, warranty, covenant, or agreement contained herein or in the Bid Procedures Order or Sale Order of which Purchaser is allegedly in breach;

(ii) if a Governmental Authority issues a Final Order prohibiting the transactions contemplated hereby where such Order was requested, encouraged, or supported by Purchaser; or

(iii) if Purchaser is not the successful bidder at any auction.

10.2    Effect of Termination.

(a)    In the event of termination of this Agreement by Purchaser or Seller pursuant to this Article 10, all rights and obligations of the parties under this Agreement shall terminate without any liability of any party to any other party, except for (1) Purchaser's obligation to take all actions reasonably necessary to cause the Escrow Agent to make the disbursement required by Section 10.2(b) if this Agreement is terminated pursuant to Section 10.1(c)(i) or Section 10.1(c)(ii), (2) Seller's obligation to pay the Due Diligence Reimbursement Fee as required by Section 10.2(c) if this Agreement is terminated pursuant to Section 10.1(b)(iv) or Section 10.1(b)(iii), and (3) Seller's liability to take all actions reasonably necessary to cause the Escrow Agent to make the disbursement required by Section 10.2(d) if this Agreement is terminated other than pursuant to Section 10.1(c)(i) or Section 10.1(c)(ii). The provisions of this Section 10.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1 and Article 11), shall expressly survive the termination of this Agreement.

(b)    In the event of a termination of this Agreement pursuant to Section 10.1(c)(i) or Section 10.1(c)(ii), Seller shall be entitled to disbursement of the Deposit no later than two (2) Business Days after the effective date of such termination, and such disbursement to Seller (the "Liquidated Damages Amount") shall be Seller's sole remedy and recourse against Purchaser for termination of this Agreement under Section 10.1(c)(i) and/or Section 10.1(c)(ii).

(c)    In the event that Purchaser is not the successful bidder at an auction of the Purchased Assets following Seller's notice of sale and solicitation of competing offers, and an Alternative Transaction closes, but subject to Bankruptcy Court approval, Purchaser shall receive payment from the sale proceeds of the Purchased Assets (1) an amount to reimburse Purchaser for due diligence costs incurred by Purchaser in presenting and proceeding with the offer and proposed transactions under this Agreement, and (2) a break-up fee of $75,000.00 to compensate Purchaser for its time and efforts hereunder (such costs and the break-up fee collectively being the "Due Diligence Reimbursement Fee"), which Due Diligence Reimbursement Fee shall not exceed $250,000 unless approved by the Bankruptcy Court, and which payment shall be made at the closing of the Alternative Transaction. For costs as to which Purchaser seeks reimbursement as part of the Due Diligence Reimbursement Fee, Purchaser shall provide Seller reasonable documentation or other proof of such costs.

(d)        In the event of a termination of this Agreement other than pursuant to Section 10.1(c)(i) or Section 10.1(c)(ii), Purchaser shall be entitled to disbursement of the Deposit.  However, if Purchaser has agreed to remain a 'back-up' bidder for the Purchased Assets, the Deposit will not be disbursed to Purchaser until the Alternate Transaction has closed. Purchaser's right to receive return of its Deposit shall be the sole and exclusive remedy available to Purchaser against Seller with respect to this Agreement, the other Transaction Documents and the transactions contemplated hereby or thereby in the event that this Agreement is terminated, and Seller shall not have any further liability or obligation relating to or arising out of this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby.  Notwithstanding the foregoing, Purchaser shall receive payment of the Due Diligence Reimbursement Fee as provided in Section 10.2(c).

(e)        Each party acknowledges that the agreements contained in this Section 10.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such party would not have entered into this Agreement, and that any amounts payable pursuant to this Section 10.2 do not constitute a penalty.

## ARTICLE 11

## GENERAL PROVISIONS

11.1    Survival.  All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms.   All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Proceedings for damages in respect of any breach thereof.

11.2    Public Announcements.  Unless otherwise required by the Bankruptcy Court or applicable Law or by obligations of Purchaser or Seller pursuant to any listing agreement with or rules of any securities exchange, Purchaser and Seller shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby, or the activities and operations of the other and shall not issue any such release or make any statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

11.3    Notices.  All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested), (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), or (e) sent by e-mail (with written confirmation of receipt), in each case to the appropriate addresses, Representatives (if applicable), facsimile numbers and e-mail addresses set forth below (or to such other addresses, Representatives, facsimile numbers or e-mail addresses as a party may designate by notice to the other parties pursuant to the terms hereof):

(i)           If to Seller, then to:

Briar's Creek Golf, LLC
Attn:   Paul Kimball
       James M. Coyne
4000 Briar's Creek Lane
John's Island, SC 29455
E-mail: jcoyne@briarscreek.com
Fax #: 843-768-3026

with a copy (which shall not constitute notice) to:

G. William McCarthy, Jr., Esquire
McCarthy Law Firm, LLC
1517 Laurel Street (29201)
P. O. Box 11332
Columbia, SC 29211-1332
E-mail: bmccarthy@mccarthy-lawfirm.com
Fax #: 803-753-6960

(ii)          If to Purchaser, then to:

Briar's Creek Holdings, LLC
Attn:   John D. Carifa
3480 3 Creek Drive
Jackson, Wyoming 83001
E-mail: jdcarifa@yorkhillinvestments.com

with a copy (which shall not constitute notice) to:

Nexsen Pruet, LLC
Attn:   J. David Hawkins
205 King Street, Suite 400
Charleston, SC  29401
E-mail: dhawkins@nexsenpruet.com
Fax #:  843-414-8207

Suzie Thomas, Esquire
The McNair Group
Senior Vice President
General Counsel and Chief Administrative Officer
109 N. Post Oak Lane, Suite 600
Houston, Texas 77024
E-mail:  suzie.thomas@houstontexans.com
Fax #: 832-667-2080

11.4    Waiver.  Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege. To the maximum extent permitted by applicable law, (a) no waiver that may be given by a party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one party shall be deemed to be a waiver of any right of the party giving such notice or demand to take further action without notice or demand.

11.5    Entire Agreement; Amendment.  This Agreement (including the Schedules and the Exhibits) and the Transaction Documents supersede all prior agreements between Purchaser and Seller with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Purchaser and Seller with respect to their subject matter. This Agreement may not be amended except by a written agreement executed by all of the parties.

11.6    Assignment.  This Agreement, and the rights, interests, and obligations hereunder, shall not be assigned by any party by operation of law or otherwise without the express written consent of the other parties (which consent may be granted or withheld in the sole discretion of such other party).

11.7    Severability.  The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefore in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

11.8    Expenses.  Except as otherwise expressly provided in this Agreement (including the Due Diligence Reimbursement Fee under Section 10.2(c)), the parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries, and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby.

11.9    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of South Carolina applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of South Carolina applicable hereto.

(b)    Without limitation of any party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the

terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Proceedings arising out of or relating to this Agreement shall be heard and determined in a South Carolina state court or a federal court sitting in the State of South Carolina, and the parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Proceeding and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Proceeding.  The parties consent to service of process by mail (in accordance with Section 11.3) or any other manner permitted by law.

(c)        THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT, OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLER, PURCHASER, OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

11.10    Counterparts.  This Agreement and any amendment hereto may be executed in one or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall be deemed to constitute one and the same instrument.  Notwithstanding anything to the contrary in Section 11.3, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile, or email attachment shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

11.11    Parties in Interest; No Third Party Beneficiaries.  This Agreement shall inure to the benefit of and be binding upon the parties and their respective successors and permitted assigns.  This Agreement is for the sole benefit of the parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy, or right of any kind.

11.12    Non-Recourse.    No past, present, or future director, officer, employee, incorporator, member, partner, or equity holder of Purchaser or Seller shall have any liability for any obligations or liabilities of such party under this Agreement or any Transaction Document, for any claim based on, in respect of, or by reason of the transactions contemplated hereby and thereby.

11.13    Schedules; Materiality.  The inclusion of any matter in any Schedule shall be deemed to be an inclusion for all purposes of this Agreement, to the extent that such disclosure is sufficient to identify the Section to which such disclosure is responsive, but inclusion therein shall not be deemed to constitute an admission, or otherwise imply, that any such matter is material or creates a measure for materiality for purposes of this Agreement.  The disclosure of any particular fact or item in any Schedule shall not be deemed an admission as to whether the fact or item is "material" or would constitute a "Material Adverse Effect."

11.14   <u>Specific Performance for Post-Closing Covenants</u>.   Solely with respect to the parties' respective covenants under this Agreement that survive the Closing, and solely to the extent to be performed after the Closing, (a) each party recognizes that if such party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching party or parties for their injuries, (b) the non-breaching party or parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of such covenants, (c) if any Proceeding is brought by the non-breaching party or parties to enforce such covenants, the party in breach shall waive the defense that there is an adequate remedy at law, (d) each party agrees to waive any requirement for the security or posting of any bond in connection with any Proceeding seeking specific performance of such covenants, and (e) each party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants.   Notwithstanding any other provision of this Agreement to the contrary, no party shall be entitled to any equitable remedy, including an injunction or order for specific performance, to enforce any provision of this Agreement prior to the Closing.

11.15   <u>No Special Damages</u>.   Notwithstanding anything to the contrary set forth in this Agreement, no party shall be liable to or otherwise responsible to any other party or any other Person for exemplary, punitive, consequential, indirect, incidental, or other special damages (including loss of revenue, income, or profits or loss in value of assets or securities) for any matter arising out of or relating to this Agreement or any other Transaction Document and the transactions contemplated hereby or thereby, regardless of how caused and regardless of the theory of recovery.

11.16   <u>Interpretation</u>.

(a)      Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)      When calculating the period of time before which, within which, or following which any act is to be done pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.   If the first or last day of such period is not a Business Day, the period in question shall begin or end on the next succeeding Business Day, as the case may be.

(ii)      All Exhibits and Schedules attached hereto or referred to are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)      Any reference in this Agreement to gender includes all genders, and words imparting the singular number include the plural and vice versa.

(iv)      The provision of a table of contents, the division of this Agreement into Articles, Sections, and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or

interpretation of this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(v)    Words such as "herein," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires. The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(vi)    Any reference in this Agreement to "$" or "dollars" means United States dollars.

(b)    Purchaser and Seller participated jointly in the preparation, negotiation, and drafting of this Agreement and the Transaction Documents, and this Agreement and the Transaction Documents shall be construed as being jointly drafted. No presumption shall favor or disfavor any party hereto by virtue of authorship. No rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement or the Transaction Documents.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the date hereof.

SELLER:

BRIAR'S CREEK GOLF, LLC

By: _____
Its: _____
Title: _____

PURCHASER:

BRIAR'S CREEK HOLDINGS, LLC
By: RCM Recreational Properties LLC,
its Manager

By: _~Robert C McNair~_____
Name Its: _Robert C McNair_____
Title: _Chairman_____

40

interpretation of this Agreement. All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

(v)    Words such as "herein," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires. The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

(vi)    Any reference in this Agreement to "$" or "dollars" means United States dollars.

(b)    Purchaser and Seller participated jointly in the preparation, negotiation, and drafting of this Agreement and the Transaction Documents, and this Agreement and the Transaction Documents shall be construed as being jointly drafted. No presumption shall favor or disfavor any party hereto by virtue of authorship. No rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement or the Transaction Documents.

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered by their duly authorized representatives, all as of the date hereof.

SELLER:

BRIAR'S CREEK GOLF, LLC

By: _Michael S. Martin_
Its: _as authorized by Executive Committee_
Title: _Michael S. Martin, Founder_

PURCHASER:

BRIAR'S CREEK HOLDINGS, LLC

By: _____
Its: _____
Title: _____

40

## **Schedue 1(a)**

### **Real Property**

See attached Preliminary Legal Description

## Schedule 1(b)

**Encumbrances**

See attached List of Encumbrances

See Bankruptcy Court records for all mortgage and security interests of record. These are disclosed in the filings made by Briar's Creek Golf, LLC in the Bankruptcy Court and will be removed of record by the Sale Order so that the Purchased Assets can be sold free and clear of such monetary liens.

See Permitted Encumbrances attached.

## <u>Schedule 1(c)</u>

**Assigned Contracts**

[Open]

**<u>Schedule 1(d)</u>**


**Trademarks**


Seller owns no registered Trademarks, and there are no pending applications for registration of any Trademarks.  Seller's trade name, "The Golf Club at Briar's Creek," and variants of this name, along with Seller's logos and signage are believed to be the only items within the defined term of "Trademarks" under this Agreement.

## Schedule 1(e)

**Vehicles**

2002 Chrysler Town and Country

2009 Dodge Ram Pick Up Truck

**<u>Schedule 5.3</u>**

**Consents**

Sale Order

## **Schedule 5.4**

### **Conflicts**

Not Applicable

**Schedule 5.6**

**Status of Assigned Contracts**

Seller is current in all of its obligations under the Assigned Contracts listed in <u>Schedule 1(c)</u>.

## Schedule 5.7(c)

**Real Property Proceedings**

None

## Schedule 5.8

**Environmental Matters**

None

## Schedule 5.10

**Employees**

[Open]

**<u>Schedule 5.11</u>**


**Employee Benefits**


[Open]

**<u>Schedule 5.12(b)</u>**

**Infringement**

None

**<u>Schedule 5.12(c)</u>**


**Third Party Intellectual Property Rights**


Software

North Star POS and accounting software

Adobe Suite

Symantic Security

Net Nanny (Security)

## Schedule 5.13

**Proceedings**

None except:

*Robert A. Nigro v. Briar's Creek Golf Club, LLC d/b/a The Golf Club at Briar's Creek*, Case No. 2014-CP-10-7068 in the Court of Common Pleas for Charleston County, South Carolina

## Schedule 5.14

**Compliance with Laws**

None

**<u>Schedule 7.4</u>**


**Pre-Closing Operations**


See 7.4(b)(i)

## Schedule 8.2(k)

**Employees/Accrued Vacation/PTO**

[Open]

**EXHIBIT A**

**DEED**


**[TO BE PROVIDED]**

## EXHIBIT B

## BILL OF SALE AND ASSIGNMENT

This Bill of Sale and Assignment is made as of the __ day of _____, 2015, by Briar's Creek Golf Club, LLC, a South Carolina limited liability company, as the Chapter 11 debtor-in-possession ("Seller") in Bankruptcy Case No. 15-_____ in the United States Bankruptcy Court for the District of South Carolina, for the benefit of Briar's Creek Holdings, LLC, a Delaware limited liability company, or its assigns ("Purchaser").

In consideration of the consummation of the transactions contemplated by that certain Asset Purchase Agreement dated February __, 2015 by and between Seller and Purchaser (the "Purchase Agreement"), and other good and valuable consideration, Seller hereby sells, transfers, assigns, conveys, and delivers to Purchaser all of Seller's right, title, and interest in, to, and under the Purchased Assets, subject to all of the terms and conditions of the Purchase Agreement.  Nothing contained in this Agreement shall be deemed to supersede or otherwise affect any of the obligations, agreements, covenants, representations, or warranties of Seller contained in the Purchase Agreement.  Capitalized terms not otherwise defined herein have the meanings assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF Seller has caused this Agreement to be executed by its authorized representative as of the date first stated above.


By:  _____

Title: _____

2

# EXHIBIT C

## ASSIGNMENT AND ASSUMPTION AGREEMENT

This Assignment and Assumption Agreement (this "Agreement") is made as of the __ day of _____, 2015, by and between by Briar's Creek Golf, LLC, a South Carolina limited liability company, as the Chapter 11 debtor-in-possession ("Seller") in Bankruptcy Case No. 15-_____ in the United States Bankruptcy Court for the District of South Carolina, and Briar's Creek Holdings, LLC, a Delaware limited liability company, or its assigns ("Purchaser").

## RECITALS

A.   Seller and Purchaser are parties to that certain Asset Purchase Agreement dated February __, 2015 (the "Purchase Agreement");

B.   Pursuant to the Purchase Agreement, Seller and Purchaser are entering into this Agreement.

## AGREEMENT

In consideration of the recitals, the consummation of the transactions contemplated by the Purchase Agreement, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.   <u>Assignment</u>.   Seller hereby sells, transfers, assigns, conveys, and delivers to Purchaser all of Seller's right, title, and interest in, to, and under the Assigned Contracts.

2.   <u>Assumption</u>.   Buyer hereby assumes and agrees to pay, perform, and discharge the Assumed Liabilities.

3.   <u>The Purchase Agreement</u>.   Nothing contained in this Agreement shall be deemed to supersede or otherwise affect any of the obligations, agreements, covenants, representations, or warranties of Seller contained in the Purchase Agreement.   Capitalized terms not otherwise defined herein have the meanings assigned to them in the Purchase Agreement.

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective authorized representatives as of the date first stated above

By: _____

Title: _____

_____

By: _____

Title: _____

# EXHIBIT D

## ESCROW AGREEMENT

## ESCROW AGREEMENT

This Escrow Agreement (the "Agreement"), dated as of _____, 2015 (the "Effective Date"), among **Briar's Creek Holdings, LLC**, a Delaware limited liability company ("Buyer"); _____ ("Escrow Agent"); and **Briar's Creek Golf, LLC**, a South Carolina limited liability company, as the Chapter 11 debtor-in-possession ("Seller") in Bankruptcy Case No. 15-_____ in the United States Bankruptcy Court for the District of South Carolina.

Buyer, Seller, and other related parties have entered into that certain Asset Purchase Agreement dated as of February __, 2015, respecting the sale of substantially all assets of Seller to Buyer and related transactions (the "APA").   Pursuant to the APA, $500,000 (the "Deposit") is to be deposited in trust by Buyer with the Escrow Agent and disbursed in accordance with the APA.  Escrow Agent has agreed to serve as Escrow Agent for Buyer and Seller as contemplated in the APA.  Capitalized terms used in this Agreement without definition shall have the respective meanings ascribed to them in the APA.

NOW THEREFORE, in consideration of the foregoing premises, the mutual covenants hereinafter contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **ESTABLISHMENT OF ESCROW**

(a)    Pursuant to the APA, upon the Effective Date Buyer shall deposit with Escrow Agent the amount of $500,000.00 in immediately available US funds (as increased by any earnings thereon and as reduced by any disbursements under this Agreement, or losses on investments, the "Escrow Fund").  Escrow Agent shall acknowledge receipt thereof by notice to Buyer and Seller.

(b)    Escrow Agent hereby agrees to act as escrow agent and to hold, safeguard and disburse the Escrow Fund pursuant to the terms and conditions hereof.

(c)    The Escrow Fund shall be deemed the "Deposit" as specified in the APA and disbursed by Escrow Agent in accordance with the terms of the APA as specified therein.

2.    **INVESTMENT OF FUNDS**

Except as Buyer and Seller may from time to time jointly instruct Escrow Agent in writing, the Escrow Fund shall be invested from time to time, to the extent possible, in an interest bearing money market deposit account at a federally-insured bank, savings & loan association, savings bank or similar institution (the "Escrow Bank"), a registered money market mutual fund, United States Treasury Bills or similar interests having a remaining maturity of thirty (30) days or less, or repurchase obligations secured by such United States Treasury Bills, with any remainder being deposited and maintained in a money market deposit account at Escrow Bank, or a registered money market mutual fund, until disbursement of the entire Escrow Fund. Escrow Agent is authorized to liquidate in accordance with customary, commercially reasonable procedures any portion of the Escrow Fund consisting of investments to provide for payments required to be made under this Agreement.

3.    **DISBURSEMENT**

The Escrow Agent shall disburse the Escrow Funds in any manner (i) on or prior to the expiration of the Due Diligence Period (as defined in Section 7.1(a) of the APA), as directed in writing by Buyer and (ii) on and after such date as jointly directed in writing by Buyer and Seller.   However, in the event of any disagreement between the parties upon the Escrow Agent with respect to the release of the Escrow Funds, Escrow Agent shall refuse to comply with any such instruction, claim or demand so long as such disagreement shall continue; and in so refusing, the Escrow Agent shall not release the Escrow Fund.  Escrow Agent shall not be or become liable in any way for its failure or refusal to comply with any such conflicting instructions or adverse claims or demands; and it shall be entitled to continue to refrain from acting until such conflicting instructions or adverse claims or demands (a) shall have been adjusted by agreement and it shall have been notified in writing thereof by the parties hereof or (b) shall have finally been determined in a court of competent jurisdiction.

4.    **TERMINATION OF ESCROW**

Escrow Agent shall pay and distribute the Escrow Fund as provided in the APA, whereupon this Agreement shall terminate and be of no further force or effect; provided, however that Section 5(b) of this Agreement shall survive termination.

5.    **DUTIES OF ESCROW AGENT**

(a)    Escrow Agent shall not be under any duty to give the Escrow Fund held by it hereunder any greater degree of care than it gives its own similar property and shall not be required to invest any funds held hereunder except as directed in this Agreement.  Escrow Agent is expressly authorized to deliver the payments required hereunder by: (i) wire transfer to an account designated in writing by the recipient; (ii) immediately available US funds by personal delivery to the recipient; or (iii) certified or bank check delivered to the recipient by UPS Next Day Air, Federal Express Standard or Priority Overnight, or US Postal Service Express Mail. Escrow Agent shall have no responsibility for the safekeeping or delivery of payments after wire transfer, personal delivery or placement with the carrier as described above.

(b)    Escrow Agent shall not be liable, except for its own gross negligence or willful misconduct and, except with respect to claims based upon such gross negligence or willful misconduct that are successfully asserted against Escrow Agent, Buyer and Seller shall jointly and severally indemnify and hold harmless Escrow Agent (and any successor Escrow Agent) from and against any and all losses, liabilities, claims, actions, damages and expenses, (including reasonable attorneys' fees and disbursements), which the Escrow Agent may incur, in good faith, or have asserted against it in the exercise and performance of any of its powers and duties hereunder or otherwise arising out of and in connection with this Agreement; provided however, that as among Seller and Buyer, each of such parties agree to contribute to any such indemnity payment to or on behalf of Escrow Agent as follows: (a) Buyer shall pay 50% of such indemnity payment, and (b) Seller shall pay 50% of such indemnity payment; provided further, however, that if either Buyer or Seller asserts a claim against Escrow Agent and does not prevail on such claim, each of such parties agree to contribute to any such indemnity payment to Escrow Agent as follows: (a) Buyer shall pay 100% of such indemnity payment if Buyer was the claimant and

2

did not prevail, and (b) Seller shall pay 100% of such indemnity payment if Seller was the claimant and did not prevail.  Without limiting the foregoing, Escrow Agent shall in no event be liable in connection with its investment or reinvestment of any funds held by it hereunder in good faith in accordance with the terms hereof, including, without limitation, any liability for any delays (not resulting from its gross negligence or willful misconduct) in the investment, reinvestment, or delay of any payment or disbursement of the Escrow Fund, or any loss of interest incident to any such delays.

(c)    Escrow Agent shall be entitled to rely upon any order, judgment, certification, demand, notice, instrument or other writing delivered to it hereunder without being required to determine the authenticity or the correctness of any fact stated therein or the propriety or validity of the service thereof.  Escrow Agent may act in reliance upon any instrument or signature believed by it to be genuine and may assume that the person purporting to give receipt or advice or make any statement or execute any document in connection with the provisions hereof has been duly authorized to do so.  Escrow Agent may conclusively presume that any of the following representatives of the parties hereto has full power and authority to instruct Escrow Agent on behalf of that party unless written notice to the contrary is delivered to Escrow Agent by such party: as to Seller – _____; as to Buyer – _____.

(d)    Escrow Agent may act pursuant to the advice of separate counsel with respect to any matter relating to this Agreement and shall not be liable for any action taken or omitted by it in good faith in accordance with such advice.

(e)    Escrow Agent does not have any interest in the Escrow Fund deposited hereunder but is serving as escrow holder only and has only possession thereof for the benefit of Seller and Buyer.  Any payments of income from this Escrow Fund shall be subject to withholding regulations then in force with respect to United States taxes.  The parties hereto will provide Escrow Agent with appropriate Internal Revenue Service Forms W-9 for tax identification number certification, or non-resident alien certifications.

(f)    Escrow Agent (and any successor Escrow Agent) may at any time resign as such by delivering the Escrow Fund to any successor Escrow Agent jointly designated by the other parties hereto in writing, or to any court of competent jurisdiction, whereupon Escrow Agent shall be discharged of and released from any and all further obligations arising in connection with this Agreement.  The resignation of Escrow Agent will take effect on the earlier of (i) the appointment of a successor (including a court of competent jurisdiction) or (ii) the day that is thirty (30) days after the date of delivery of its written notice of resignation to the other parties hereto.  If at that time Escrow Agent has not received a designation of a successor Escrow Agent, Escrow Agent's sole responsibility after that time shall be to retain and safeguard the Escrow Fund until receipt of a designation of successor Escrow Agent or a joint written disposition instruction by the other parties hereto or a final non-appealable order of a court, arbitrator, or other tribunal of competent jurisdiction.

(g)    In the event of any disagreement between the other parties hereto resulting in adverse claims or demands being made in connection with the Escrow Fund or in the event that Escrow Agent is in doubt as to what action it should take hereunder, Escrow Agent shall be entitled to retain the Escrow Fund until Escrow Agent shall have received (i) a final

non-appealable order of a court, arbitrator, or other tribunal of competent jurisdiction directing delivery of the Escrow Fund or (ii) a written agreement executed by the other parties hereto directing delivery of the Escrow Fund, in which event Escrow Agent shall disburse the Escrow Fund in accordance with such order or agreement.  Any such order shall be accompanied by a legal opinion by counsel for the presenting party satisfactory to Escrow Agent to the effect that such order is final and non-appealable.  Escrow Agent shall act on such order and legal opinion without further question.

(h)    Buyer shall pay Escrow Agent compensation (as payment in full) for the services to be rendered by Escrow Agent hereunder in the amounts and at the times specified in Exhibit A, and agree to reimburse Escrow Agent for all reasonable expenses, disbursements and advances incurred or made by Escrow Agent in performance of its duties hereunder (including reasonable fees, expenses and disbursements of its counsel).  Any such compensation and reimbursement to which Escrow Agent is entitled shall be withdrawn from the Escrow Fund. Any fees or expenses of Escrow Agent or its counsel that are not paid as provided for herein may be taken from the Escrow Fund held by Escrow Agent hereunder, but all fees or expenses for which Seller is responsible shall be reimbursed to Buyer promptly upon written demand from Buyer.

(i)    No printed or other matter in any language (including, without limitation, prospectuses, notices, reports and promotional material) that mentions Escrow Agent's name or the rights, powers, or duties of Escrow Agent shall be issued by the other parties hereto or on such parties' behalf unless Escrow Agent shall first have given its specific written consent thereto.

(j)    Anything contained herein to the contrary notwithstanding at any time Escrow Agent in its discretion is unable to determine the proper disposition of the Escrow Fund or any portion thereof, then, after ten (10) days' notice to Buyer and Seller, Escrow Agent shall be entitled (but not obligated) to deposit the Escrow Fund or control thereof with a Proper Court and interplead Buyer and Seller with respect thereto, whereupon Escrow Agent shall be discharged of and released from any and all further obligations arising in connection with this Agreement.

(k)    This Section 5 shall survive notwithstanding any termination of this Agreement or the resignation of Escrow Agent.

## 6.    LIMITED RESPONSIBILITY

This Agreement expressly sets forth all the duties of Escrow Agent with respect to any and all matters pertinent hereto.  No implied duties or obligations shall be read into this Agreement against Escrow Agent.  Escrow Agent shall not be bound by the provisions of any agreement among the other parties hereto except this Agreement.

## 7.    OWNERSHIP FOR TAX PURPOSES

Buyer agrees that, for purposes of federal and other taxes based on income, Buyer will be taxed as the owner of the Escrow Fund, and that Buyer will report all income, if any, that is earned on,

or derived from, the Escrow Fund as its income, in such proportions, in the taxable year or years in which such income is properly includible and pay any taxes attributable thereto, subject to adjustments in the event Seller is remitted the Escrow Funds upon termination of the APA without the Closing having occurred.

**8.    JURISDICTION**

Seller, Buyer, and Escrow Agent hereby irrevocably submit in any suit, action or proceeding arising out of or related to this Agreement or any of the transactions contemplated hereby to the jurisdiction of the United States Bankruptcy Court for the District of South Carolina and waive any and all objections to jurisdiction that they may have under the laws of any other state.  The parties agree to this forum selection and that it excludes all other courts before which the parties, their successors, and assigns, could otherwise properly bring an action.

**9.    NOTICES**

All notices, consents, waivers and other communications under this Agreement must be in writing and shall be deemed to have been duly given when (a) delivered by hand (with written confirmation of receipt), (b) sent by facsimile (with written confirmation of receipt), (c) received by the addressee, if sent by a delivery service (prepaid, receipt requested), or (d) received by the addressee, if sent by registered or certified mail (postage prepaid, return receipt requested), in each case to the appropriate addresses, representatives (if applicable) and facsimile numbers set forth below (or to such other addresses, representatives, and facsimile numbers as a party may designate by notice to the other parties pursuant to the terms hereof):

(i)    **If to Seller, then to:**

Briar's Creek Golf, LLC
Attn:  Paul Kimball
  James M. Coyne
4000 Briar's Creek Lane
John's Island, SC 29455
E-mail: jcoyne@briarscreek.com
Fax #: 843-768-3026

with a copy (which shall not constitute notice) to:

G. William McCarthy, Jr., Esquire
McCarthy Law Firm, LLC
1517 Laurel Street (29201)
P. O. Box 11332
Columbia, SC 29211-1332
E-mail: bmccarthy@mccarthy-lawfirm.com
Fax #: 803-753-6960

(ii)        **If to Buyer, then to:**

Briar's Creek Holdings, LLC
Attn: John D. Carifa
3480 3 Creek Drive
Jackson, Wyoming 83001
E-mail: jdcarifa@yorkhillinvestments.com

with a copy (which shall not constitute notice) to:

Nexsen Pruet, LLC
Attn:   J. David Hawkins
205 King Street, Suite 400
Charleston, SC  29401
E-mail: dhawkins@nexsenpruet.com
Fax #:  (843) 414-8207

(iii)       **If to Escrow Agent, then to:**

_____
Attn:_____
_____
_____
E-mail:_____
Fax #:_____

## 10.    COUNTERPARTS

This Agreement may be executed in one or more counterparts, each of which will be deemed to be an original and all of which, when taken together, will be deemed to constitute one and the same instrument.

## 11.    USAGE.

Capitalized terms used herein which are not otherwise defined herein shall have the meanings ascribed to them in the APA.  The section and paragraph headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Terms such as "hereof," "hereunder," "hereto," "herein," and words of similar import shall refer to this Agreement in its entirety.

## 12.    WAIVER

The rights and remedies of the parties to this Agreement are cumulative and not alternative. Neither the failure nor any delay by any party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement will operate as a waiver of such right, power, or privilege, and no single or partial exercise of any such right, power, or privilege will preclude any other or further exercise of such right, power, or privilege or the exercise of

any other right, power, or privilege.  To the maximum extent permitted by applicable law, (a) no claim or right arising out of this Agreement or the documents referred to in this Agreement can be discharged by one party, in whole or in part, by a waiver or renunciation of the claim or right unless in writing signed by the other party; (b) no waiver that may be given by a party will be applicable except in the specific instance for which it is given; and (c) no notice to or demand on one party will be deemed to be a waiver of any obligation of such party or of the right of the party giving such notice or demand to take further action without notice or demand as provided in this Agreement or the documents referred to in this Agreement.  This Agreement does not constitute an exclusive remedy or otherwise limit the remedies (or impair the limitations thereof) of Buyer or Seller arising under the APA or any other agreement or instrument ancillary thereto.

## 13.    EXCLUSIVE AGREEMENT AND MODIFICATION

This Agreement supersedes all prior agreements among the parties with respect to the subject matter hereof and constitutes (along with the documents referred to in this Agreement) a complete and exclusive statement of the terms of the agreement between the parties with respect to its subject matter.  This Agreement may not be amended except by a written agreement executed by Buyer, Seller and the Escrow Agent.  This Agreement and the escrow arrangements contemplated herein shall not relieve Seller from their covenants and warranties set forth in the APA.

## 14.    GOVERNING LAW

This Agreement shall be governed by the laws of the State of South Carolina, without regard to the South Carolina conflicts of law principles.

## 16.    INJUNCTIVE RELIEF

Seller and Buyer acknowledge that a breach of this Agreement could result in immediate and irreparable harm for which the remedy of monetary damages alone might be inadequate. Therefore, Seller and Buyer shall be entitled to seek injunctive and other equitable relief against the other respecting their rights under this Agreement.

[SIGNATURE PAGE ATTACHED]

7

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Escrow Agreement to be legally binding and effective as of the day and year first above written.

<u>BUYER</u>:

**Briar's Creek Holdings, LLC**, a Delaware limited liability company


By: _____
Name:_____
Title: _____

<u>SELLER</u>:

**Briar's Creek Golf, LLC**, a South Carolina limited liability company, as the Chapter 11 debtor-in-possession in Bankruptcy Case No. 15-_____ in the United States Bankruptcy Court for the District of South Carolina


By: _____
Name: _____
Title: _____

<u>ESCROW AGENT</u>:


_____


By: _____
Name: _____
Title: _____

<u>EXHIBIT A</u>

Escrow Agent's Fees

**[To be Included]**

**EXHIBIT E**

**ASSIGNMENT OF TRADEMARKS**

     This Assignment of Trademarks is made and entered into as of the __ day of _____, 2015, by _____, a _____-("Assignor"), for the benefit of _____, a _____ ("Assignee"), with its principal office at _____.

     A.    Assignor is the owner of the trademark applications described on <u>Annex 1</u> attached hereto (the "Trademark Applications"); and

     B.    Assignee desires to acquire from Assignor the Trademark Applications and the goodwill evidenced thereby and by the trademarks applied for therein.

     In consideration of one dollar ($1.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby sells, assigns, and transfers to Assignee, Assignor's entire right, title, and interest in and to the Trademark Applications, the goodwill of the business symbolized thereby and by the trademarks applied for therein, and all claims and demands, if any, that Assignor may have in connection with the Trademark Applications arising on or before the date of this Assignment.

     Assignor is contemporaneously herewith transferring to Assignee substantially all of the assets, and Assignee will succeed to the business of Assignor, to which the Trademark Applications and the trademarks applied for therein pertain.

     The terms and provisions of this Assignment of Trademarks shall inure to the benefit of Assignee and its successors and assigns.

     **IN WITNESS WHEREOF**, Assignor has caused this Assignment of Trademarks to be executed by its authorized representative as of the date first stated above.

_____

By: _____

Title: _____

**STATE OF SOUTH CAROLINA  )**

                                         **) ss**

**COUNTY OF CHARLESTON      )**

      _____, known to me to be the _____ of _____, personally appeared before me this __ day of _____, 2015, and executed or acknowledged to me that he executed the foregoing Assignment of Trademarks on behalf of _____ and pursuant to authority duly received.


                      _____

                      Notary Public                              (SEAL)

                      State of _____

                      My Commission expires: _____

**ANNEX 1**

| Trademark | Goods | Application Number/Date |
|-----------|-------|-------------------------|
|           |       |                         |
|           |       |                         |
|           |       |                         |