# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF SOUTH CAROLINA

In re:                                          Case No. 15-00712-jw

                                                Chapter 11

      Briar's Creek Golf, LLC,
      d/b/a The Golf Club at Briar's Creek,

          Debtor.

---

## DEBTOR'S DISCLOSURE STATEMENT

Filed by the Debtor-in-Possession on February 27, 2015

---

**Submitted by**:    MCCARTHY LAW FIRM, LLC
G. William McCarthy, Jr., I.D.#2762
Daniel J. Reynolds, Jr., I.D.#9232
W. Harrison Penn, I.D.#11164
*Attorneys for the Debtor*
1517 Laurel Street
P.O. Box 11332
Columbia, SC 29201-1332
(803) 771-8836
(803) 765-6960 (fax)

THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN.  ACCEPTANCES MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

# DEBTOR'S DISCLOSURE STATEMENT

## Table of Contents

| | | **Page** |
|---|---|---|
| I. | Introduction | 3 |
| II. | History and Events Leading to Bankruptcy | 4 |
| III. | Post-Petition Activity | 9 |
| IV. | Property of the Debtor | 12 |
| V. | Summary of Proposed Plan | 13 |
| | Plan Classifications | 13 |
| VI. | Executory Contracts | 19 |
| VII. | Liquidation and Other Alternatives | 20 |
| VIII. | Feasibility of Plan | 21 |
| IX. | Further Financial Information | 21 |
| X. | Certain Risk Factors to be Considered | 22 |
| XI. | Tax Consequences | 23 |
| XII. | Conclusion | 28 |

## DEBTOR'S DISCLOSURE STATEMENT

## I.        INTRODUCTION

Briar's Creek Golf Club d/b/a The Golf Club at Briar's Creek (the "Debtor") provides this Disclosure Statement to all of its known creditors and parties in interest in order to disclose information considered by the Debtor to be important, material and necessary for creditors to make a reasonably informed decision in exercising their right to vote on the Debtor's Plan of Liquidation (the "Plan"), which Plan has been summarized herein and was filed concurrently with this Disclosure Statement (the "Disclosure Statement") in the United States Bankruptcy Court for the District of South Carolina (the "Court").  This Disclosure Statement must provide such information, as far as practicable, that would enable a hypothetical reasonable investor typical of the holders of claims against the Debtor, to make an informed judgment about the Plan.  The Debtor believes and asserts that the information provided in this Disclosure Statement gives information adequate for a hypothetical, reasonable investor to make a decision as to the Debtor's Plan.  The United States Bankruptcy Court will set a hearing to determine if this Disclosure Statement provides adequate information and conforms to the requirements of the Bankruptcy Code (11 U.S.C. §101 et seq.).

### Voting Procedures

The Court will set a separate, later date for a hearing to consider the Plan, or the Court may enter an order combining the Disclosure Statement and Plan hearings.  Notice of the hearing to consider the Plan (the "Plan Confirmation Hearing") will be mailed along with the approved Disclosure Statement to all holders of claims, and upon receiving the Notice of Confirmation Hearing, holders of claims may then vote on the Plan by completing the ballot accompanying the Plan and returning such ballot to the Bankruptcy Court.  The accompanying Notice of Hearing will specify the time within which the ballots must be returned.  The vote of all creditors and holders of Claims is very important.  Because there are Impaired classes under the Plan, at least one non-insider class of Impaired Claims must accept the Plan in order for the Plan to be confirmed.  The Plan will be confirmed by the Court if the Plan is accepted by the holders of two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the creditors or holders of Claims in each class voting on the Plan, and two-thirds (2/3) in number of the holders of allowed Interests voting on the Plan.  **Please note that only the votes of creditors that submit a ballot will be counted for Plan voting purposes.**  In the event the requisite accepting

Plan ballots are not obtained, the Court may still confirm the Plan if at least one class of Impaired Claims votes in favor of the Plan, the Court finds the Plan otherwise complies with Bankruptcy Code requirements, and the Plan accords fair and equitable treatment to those classes rejecting the Plan.

### General Provisions

If it is confirmed, the Plan will be a legally binding arrangement documenting how creditors' Claims will be addressed, therefore the Plan should be read in its entirety, rather than relying solely on the summary in this Disclosure Statement.   Approval of the Disclosure Statement by the United States Bankruptcy Court <u>does</u> <u>not</u> constitute approval by the Bankruptcy Court on the merits of the Plan.

Any and all capitalized terms herein shall have the meaning prescribed such terms in the Debtor's Plan, or if no such definition is set forth in the Plan, then such words shall be read to have the meaning prescribed in the United States Bankruptcy Code.  If any capitalized terms are not defined in the Plan or the United States Bankruptcy Code, such terms are intended to have their common every day meaning.

EXCEPT WHERE SPECIFICALLY STATED OTHERWISE, THE DISCLOSURE STATEMENT HAS BEEN PREPARED BY THE DEBTOR AND HAS BEEN PREPARED BASED ON INFORMATION AVAILABLE TO THE DEBTOR.  NO REPRESENTATIONS CONCERNING THE DEBTOR (PARTICULARLY THE VALUE OF THE ASSETS OF THE DEBTOR) ARE AUTHORIZED OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT.  THE INFORMATION CONTAINED HEREIN HAS NOT BEEN SUBJECT TO A CERTIFIED AUDIT.  THOUGH GREAT EFFORT HAS BEEN MADE TO BE ACCURATE, THE DEBTOR IS UNABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED HEREIN IS WITHOUT ANY INACCURACY.

## II.      HISTORY OF THE DEBTOR AND EVENTS LEADING TO THE FILING OF BANKRUPTCY

In 2001 developers Steve Koenig and Ed Myrick joined with twenty other Founders to create Briar's Creek Golf LLC on River Road near Kiawah Island.  After construction was completed, the club facilities include an 18-hole championship golf course; driving range with target greens; chipping, pitching and putting areas; teaching facilities; a 12,000 square foot clubhouse, featuring a formal dining room, mixed grille, lounge, complete pro shop and locker rooms, and part ownership in a lodge which provides accommodation for visiting golfers. The golf course and facilities total approximately 300 acres.

The Debtor also intended to provide home sites for members to purchase if they desired, and over time has sold 75 lots to members and others.  Debtor retains eight developed lots of

approximately 22 acres total, which may be sold in the future, and 500 acres of undeveloped land. Approximately 100 acres of the undeveloped land is available for development according to current zoning regulations, allowing approximately 25 lots to be developed in the future. The remaining land is marshland or otherwise not suitable for development. The future lots to be developed will require roads, sewer lines and investments to provide other utilities before it can be utilized for home sites.

The Debtor has an unusual structure in which the membership universe has been kept deliberately small so as to allow for unstructured tee times (sometimes referred to as "No Tee Times") and deliberately small so as to foster a sense of fellowship among the limited number of members. The Debtor has been successful in these goals. However, an unintended consequence of Debtor's unusual structure, coupled with the economic decline of the "Great Recession" of 2008 – 2009, has limited the Debtor's membership numbers to such an extent that it has found it difficult to make payments to all of its creditors, including Resigned Golf Members. For that reason, the bankruptcy was filed. As part of its decision to file bankruptcy, Briar's Creek still desires to maintain its No Tee Times policy, and as described below, embarked on a search for a purchaser who would maintain that policy.

Debtor initially sought to organize itself through a Club membership plan (the "Membership Plan"), which called for a basic golf membership with a variation for its founders. The first page of the Debtor's Membership Plans are attached as **Exhibit A** and full copies are hereby incorporated by reference. Readers seeking to review complete copies of the membership plans may do so by emailing Debtor's counsel at bmccarthy@mccarthy-lawfirm.com or hpenn@mccarthy-lawfirm.com**.** The standard membership entitled members to usage of the clubhouse and golf facilities of the Club ("Golf Members"). The founder variation of membership held all of the privileges of a Golf Membership, but also held an ownership interest in the Debtor ("Founder Members" or "Founders"). Each Founder Member made initial capital contributions to the Debtor, which were scheduled to be repaid over time.

Golf Members and Founder Members each paid initial deposits upon joining the Club, as well as annual dues as prescribed by their Membership Agreements. Pursuant to the Membership Plan, most Membership Agreements called for refundable membership deposits that were to be repaid to the Golf Member or Founder Member at the conclusion of thirty (30) years of membership in good standing, OR upon resignation from the club. Some members have

resigned from the Club.  Those members that opted to resign from membership ("Resigned Members") were scheduled into a queue for repayment, as new memberships were accepted and new deposits were paid.  A list of Founder Members is attached as **Exhibit B**, a list detailing the claims of Debtor's 127 Refundable Golf Members is attached as **Exhibit C**, and a list of 77 Resigned Members is attached as **Exhibit D**.

Over the fifteen years of operations, 92 members have resigned and Debtor already repaid fifteen of those resigned memberships, leaving 77 Resigned Members as of the date of the filing of the bankruptcy.  A provision in the Debtors' Operating Agreement notes that in the event all Golf Members deposits are not repaid in full, then the Founder Golf Memberships will not be paid.

The "Great Recession" beginning in 2008 impacted Briar's Creek and other private golf courses.  At Briar's Creek, the sale of real estate lots slowed and the squeeze of the economic downtown on members resulted in higher resignations.  These resulted in the Debtor's inability to generate sufficient revenue to meet its obligations, and this despite membership growth as new members joined.  In response, the Debtor created a Patron Program ("Patron Program"), which solicited loans from Golf Members and Founder Members by way of a Private Placement Memorandum dated September 10, 2009, as amended by a Supplement dated November 16 and a Second Private Placement Memorandum dated December 31, 2009.  Participants in the Patron Program (the "Patron Members") made loans to the Debtor at an interest rate of 5% due and payable annually and mature on November 12, 2019.  A list of Patrons is shown as **Exhibit E**.  Readers should note that some Founders are also Patrons, but that all Patrons are also Golf Members.

To further buttress its operations and as part of the Patron Program, the Debtor entered into a Restructuring Agreement (the "Restructuring Agreement") effective December 31, 2009.  A copy of the Restructuring Agreement is attached as **Exhibit F**.  In that Restructuring Agreement, various unsecured loans made by Founders and Developers were subordinated to Patron Loans, until Patron Loans were repaid in full.  Since those Patron Loans will not in fact be repaid in full, the subordinated loans will not be paid at all under the terms of the Debtor's Plan of Reorganization.  One provision of the Restructuring Agreement recognizes the existing secured creditor position of Edward L. Myrick, Sr., described in more detail below.

Following the Restructuring Agreement Debtor made changes to its Membership Plan as

shown in **Exhibit A**.  Three Resigned Members sued the Debtor pre-petition sued the Debtor. Two of the three plaintiffs obtained judgment on their claims and were paid in full on their claims in Spring 2014.  The third plaintiff's case was pending on the petition date and is being treated pursuant to Debtor's Plan in Class 16.

Debtor is also party to five condemnation actions by Kiawah Island Utilities ("KIU"). KIU has been working throughout the condemnation process to negotiate compensation to the impacted property owners, including the Debtor.  Negotiations have proven challenging due to potential disruption to golf activity at the Club.  The parties were unable to conclude negotiations pre-petition, and negotiations continue post-petition.  Any settlement of these actions will require Bankruptcy Court approval.  Under the provisions of the Sale Motion and attached asset purchase agreement, described in greater detail below, these condemnation proceeds, if any, belong to the Debtor, or its designee, as Seller.  The value of these claims are as yet unknown.

Beginning in 2010, Debtor began offering non-refundable memberships in addition to the previous refundable memberships.  As of the date of filing of the bankruptcy, there are 71 Non-Refundable Golf Members as shown on **Exhibit G**.

When Briar's Creek determined that it would be unable to pay all creditors in the short term and also recognized that its business model needed to be changed, while still preserving its philosophy of No Tee Times, it began discreet discussions with various parties on how to adjust its business model.  Some of those discussions were with neighboring golf courses for whom an alliance or purchase would be logical and allow for growth at both clubs.  At this time, no firm proposal has been received from neighboring courses.  In the course of those discussions the Debtor received an expression of interest from one of its Founders, who is also a Golf Member and also a Patron Lender.  That Founder in turn has added two other Founders to the entity, hereafter "Purchaser" created to make an offer to the Debtor to purchase the assets and assume payment of certain specified obligations.  The remaining claims, not assumed by the Purchaser, will be paid pursuant to the Debtor's Plan summarized below.  The Purchaser has offered to pay $11,300,000 and to maintain the No Tee Times Policy and to make a subsequent $2,000,000 infusion into the new entity after closing for the purpose of creating an operating reserve and for deferred capital improvements.  The offer is described in more detail below.  The Sale Motion, with the attached Asset Purchase Agreement ("APA") the first page of which is **Exhibit H** and the entirety of which is incorporated herein by reference.  Parties seeking a complete copy of

**Exhibit H** may be obtained by emailing counsel for the Debtor at bmccarthy@mccarthy-lawfirm.com or hpenn@mccarthy-lawfirm.com.  The offer of the Purchaser will be considered at a hearing and will be subject to competing bids pursuant to a Bid Procedures Order attached as **Exhibit I.**  Readers should note that the property owned by the Debtor is subject to certain provisions under the Declarants Rights of the Property Owner's Association, of which the Debtor is the managing member.  Secured, administrative priority, lessor and contract claims will be paid in full at closing.  Golf Member and Patron claims will be paid *pari passu* after Plan confirmation.

### Debts Owed and General Treatment Under Plan

As of February 9, 2015 (the "Petition Date"), the Debtor owes secured debt of approximately $2,795,878 to SouthCoast Community Bank ("SouthCoast") on a first lien basis and approximately $3,890,732.00 to Edward L. Myrick, Sr. ("Myrick") on a second lien basis. There are some small parcels which are not encumbered by either lien, and another small group of parcels on which SouthCoast has no lien, but on which Myrick does have a lien and therefore his lien is first on those parcels.  Under the Debtor's Plan both secured creditors will be paid in full in cash or cash equivalent pursuant to assumption by Purchaser, but with a corresponding reduction in the purchase price, pursuant to the terms of the APA.

The Debtor has approximately 50 employees and owes those employees approximately $56,000 in pre-petition unsecured, priority accrued vacation/paid time off claims as of the Petition Date. These employee claims will be paid in full at closing, pursuant to the terms of the APA.

At the time of filing, the Debtor owed approximately 33 general ongoing unsecured trade vendors the approximate amount of $123,142 as well as other general unsecured debt in the approximate amount of $64,367.  These creditors will be divided into two classes, one consisting of ongoing trade vendors, who will be paid in full at closing pursuant to the APA, and another which will be paid *pari passu* with Patrons and Golf Members, as more fully described in the Plan below.  A listing of the ongoing unsecured trade vendors is attached as **Exhibit J**.

As of the time of the bankruptcy filing, Debtor had entered into approximately forty-three executory contracts with various lessors.  All executory contracts are current through date of filing and Debtor intends to keep such contracts current through confirmation of the Plan and

subsequent closing under the APA, at which time all executory contracts will be assumed and assigned to Purchaser.  Debtor anticipates no rejection damages and hence to pay $0 under the Plan on executory contracts.  A listing of executory contracts is attached as **Exhibit K**.

At the time of filing, the Debtor owed approximately $2,850,000 to its Founders and Developers for loans made or funds advanced.  Those Founder and Developer claims were subordinated in the 2009 Restructuring Agreement and are being paid $0 under the Plan.

At the time of filing, the Debtor showed approximately $14,000,000 in original equity contributions by the Founders, and those will be paid $0 under the Plan.

At the time of filing Debtor had 275 golf members, including Resigned, present Refundable Members and present Non-Refundable Members.  Readers should note that the Founder Golf Members are a subset of the golf members.

Within that overall grouping of golf memberships, Briars Creek owes an aggregate of $14,460,350 to the present Golf Members and $8,865,000 to the Resigned Members for an aggregate total of $23,325,350.

After payment of the secured claims and ongoing trade vendors, and assumption and assignment of the executory contracts, and after payments of the above amounts shown for Founder loans and Founders' equity, Debtor believes it will have approximately $4,300,000 in cash available to pay the remaining claims which consist essentially of the $2,905,830 in Patron debt and the approximately $23,325,350 in face amounts for Golf Member refunds.

The Golf Member refunds are due, without interest, 30 years after joining (unless you are a Founder golf member who will receive $0 for the membership) unless you are a Resigned Golf Member who is high enough in the queue to receive an earlier payment.  The Debtor has determined to pay all Golf Members on a net present value ("NPV") basis, and has retained its Accountant, Marty Ouzts of Ouzts Ouzts and Company to prepare the NPV analysis attached as **Exhibits C and D**.  Please note that Golf Members are intentionally shown by membership number, not by name.  Exhibits C and D consist of a chart that shows the Member's number, the face amount which he or she is owed by Briar's Creek, a reduction by net present value at 5% per annum to show the NPV, and then an amount which would be paid to each member assuming the debtor is cash flow neutral through closing date, assuming that administrative costs do not exceed the projections by professionals, assuming the sale to Purchaser timely closes, and assuming there are no higher competitive bids.  In the event any of these assumptions are

incorrect, the amount due to any golf member could rise or fall, probably very slightly.  To take one concrete example, for every $100,000 of increased administrative expenses, the payment to Golf Members will decrease by two cents ($0.02) on the dollar.  An operating budget through the anticipated sale closing is attached as **Exhibit L**.

Readers reviewing **Exhibit C**, set up by Member Number only, will note that Founders will be receiving no payment for their Golf Memberships.  In the column next the payment amount, the entry "Founder" will appear.

Purchaser will also offer members in good standing shown on Exhibits C, D, and G membership in the new club with no new membership fee required.  Pursuant to the APA, once the membership plan for the new club is completed it will be circulated to current and resigned members in good standing.  Interested parties may obtain a copy of new club's membership plan, once it is finalized, by emailing Debtor's Counsel at bmccarthy@mccarthy-lawfirm.com or hpenn@mccarthy-lawfirm.com.

A separate page on **Exhibit E** makes the same sort of calculations for Patrons.  That calculation follows the same approach and is based on the same assumptions, with the single change that since Patron loans, unlike golf memberships, are entitled to accrue interest, the NPV calculation takes such interest into account.  Readers should note that this is an accounting function, and that interest is not being paid.

The aggregate NPV for Patrons and Golf members is $11,575354.  Readers will recall that Debtor estimates there will be approximately $4,300,000 in cash available to pay that aggregate NPV amount to those classes, and with the assumptions stated above, Debtor hopes to make the *pari passu* distribution at closing or soon after in May 2015.

### III.    POST-PETITION ACTIVITY AND OPERATIONS

**Bankruptcy Filing and Meeting of Creditors**

Since the Petition Date, the Debtor has operated as a debtor in possession pursuant to 11 U.S.C. §§1107(a) and 1108 of the Bankruptcy Code.  A first meeting of creditors has been scheduled upon the Debtor's chapter 11 filing for at 9:30 AM on March 27, 2015.

**First Day Motions**

On February 10, 2015, the Debtor filed an emergency motion for an order under 11 U.S.C. Section 105(a), 363(b) and 507(a) authorizing the payment of regular employee wages and benefits and some small pre-petition bonuses. The Debtor's wage and benefits motion

proposed to pay certain necessary prepetition wage and benefit claims in order to retain employees and ensure the continuing viability of the business.  A hearing on this motion was conducted on February 13, 2015 and the relief sought was granted by the Court.  As of the date of the projected closing contemplated by the Sale Motion and APA, the Debtor notes that there will be approximately $70,000 of paid time off and other employee benefits that will be paid pursuant to the APA.

On February 10, 2015, the Debtor also filed an emergency motion for an order under 11 U.S.C. Section 366 authorizing the payment of adequate assurance to utility providers.  The Debtor's utilities motion proposed to provide prepayments to utility providers as adequate assurance of payment in order to continue uninterrupted use of the utility services.  A hearing on this motion was conducted on February 13, 2015 and the Debtor obtained final approval on Tuesday February 24.

**Employment of Professionals**

The Debtor has filed an application to appoint McCarthy Law Firm, LLC, effective as of the Petition Date, as the Debtor's bankruptcy counsel on February 10, 2015.  The Debtor filed an application to appoint Ouzts Ouzts & Company, as the Debtor's accountants for certain bankruptcy related purposes as of the Petition Date.  Debtor proposes shortly to retain the accounting firm of Dixon Hughes to file tax returns and do other related accounting functions. Debtor further proposes to hire Keen Summit as its business broker to assist in the marketing and sale of substantially all of the Debtor's assets pursuant to the Sale Motion.

**Sale and Contract Assumption Motions**

The Debtor is a private golf club on Johns Island, South Carolina with approximately 198 active members and 77 resigned members, and is engaged in the business of operating its private golf club and developing its real property.  The Debtor's assets consist primarily of real estate, specifically including an 18-hole golf course, practice facilities, a clubhouse, dining and country club facilities, golf maintenance and storage buildings, eight (8) developed lots, unimproved land for development, as well as personal property, including cash, accounts receivable, two vehicles, a boat motor, furniture, fixtures, equipment, inventory, golf course chemicals/supplies, a boat and motor, furniture, fixtures, equipment, inventory, and prepaid insurance.  Debtor's assets are more specifically described in the Debtor's Bankruptcy Schedules

(Doc. No. 1), which are hereby incorporated by reference, and in the schedules attached to the Sale Motion.

The Debtor has filed a motion for entry of an order: (1) approving the terms of a proposed sale of substantially all of the Debtor's assets, including real estate, personal property, furniture, fixtures, equipment, inventory, vehicles, contracts, permits, intellectual property, goodwill, and all documents and rights relating thereto as more fully described in the APA, to Briar's Creek Holdings, LLC, a Delaware limited liability company, or its assigns ("Purchaser"), free and clear of liens, claims, and encumbrances pursuant to 11 U.S.C. §363 for a purchase price of $11,300,000, which consists of $7,400,000 in cash and assumption of the approximately $3,890,732 secured debt owed to Edward L. Myrick, Sr., plus assumption of the post-closing liabilities under the Debtor's executory contracts and a post-closing commitment to infuse $2,000,000 into a new operating reserve, and (2) authorizing the assumption and assignment of certain executory contracts pursuant to 11 U.S.C. §365 (the "Sale Motion") (Doc. No. 3). Debtor's Sale Motion is hereby incorporated by reference. Through its Sale Motion, the Debtor additionally requests authority to distribute the Purchase Price to certain secured creditors as set forth therein and to retain any remaining proceeds pending further order of the Court. The proposed sale is subject to higher or otherwise better offers, on the same, or substantially similar terms, with such sale being free and clear of liens, claims, encumbrances, and other interests, pursuant to 11 U.S.C. §§105 and 363. The proposed sale anticipates that the Purchaser will retain the No Tee Time policy as described in this Disclosure Statement. The proposed sale does not include the sale of the Debtor's cash and cash equivalents, accounts receivable, tax refunds, corporate records, insurance policies, and any avoidance claims under Chapter 5 of the Bankruptcy Code. A hearing on Debtor's Sale Motion will be scheduled by the Court.

**Post-Petition Operations of the Debtor**

Post-petition, the Debtor manages its assets and operates its business as a debtor in possession pursuant to 11 U.S.C. §§ 1107 and 1108. As required by the United States Trustee and the Federal Rules of Bankruptcy Procedure, the Debtor files monthly operating reports detailing its post-petition operations, and the Debtor's monthly operating reports are incorporated herein by reference. As of the date of this Disclosure Statement, the Debtor's first monthly report has not yet been filed or become due. However, full copies of filed monthly operating reports may be obtained on the Bankruptcy Court's electronic database (Pacer) located at its web

page (www.scb.uscourts.gov/webpacer/webpacer.htm) or by request to Debtor's counsel at bmccarthy@mccarthy-lawfirm.com, dreynolds@mccarthy-lawfirm.com and hpenn@mccarthy-lawfirm.com.

## IV.    PROPERTY OF THE DEBTOR

**Primary Assets**

As of the Petition Date, the Debtor's assets consist primarily of real estate, specifically including an 18-hole golf course, practice facilities, a clubhouse, dining and country club facilities, golf maintenance and storage buildings, eight (8) developed lots, unimproved land for development, as well as personal property, including cash, accounts receivable, two vehicles, a boat motor, furniture, fixtures, equipment, inventory, golf course chemicals/supplies, a boat and motor, furniture, fixtures, equipment, inventory, and prepaid insurance

Additionally, at the Petition Date the Debtor has cash/accounts of approximately $420,765.15.  At the Petition date the Debtor also has receivables in the approximate amount of $282,971.65, furnishings and fixtures with a book value of approximately $213,555, and machinery and equipment worth approximately $139,550.   On the Petition Date, Debtor maintained the following inventories: (a) food in the amount of $15,009, (b) beverage in the amount of $2,001, (c) beer in the amount of $2,022, (d) wine in the amount of $8,684, (e) liquor in the amount of $2,757, (f) pro shop merchandise in the amount of $101,241, and (g) outdated merchandise in the amount of $2,000.

The authority to sell all of the assets described above is being sought pursuant to the Sale Motion.  A copy of the Debtor's operating budget through the anticipated sale closing is attached as **Exhibit L**.

**Bankruptcy and Other Causes of Action**

The Debtor is in the process of reviewing its financial records with regard to whether the Debtor has any causes of action pursuant to 11 U.S.C. §§ 547, 548, 549, and 550 ("Chapter 5 Causes of Action").  The Debtor has not completed its analysis of potential Chapter 5 Causes of Action in this matter, but such actions may specifically include, but are not limited to, any of the transactions described in more detail in the Debtor's Statement of Financial Affairs ("SoFA") filed by the Debtor as part of its Bankruptcy Schedules (Docket Item # 1 in this Case, beginning on page 49 of 66). For a detailed listing that describes the primary transactions that could give rise to Chapter 5 Causes of Action please refer to the Statement of Financial Affairs Questions 3(b), 3(c), and 23, including any amendments or addendums thereto, which are hereby

specifically incorporated in the Disclosure Statement by reference.

The Disclosure Statement and Plan have been filed early in this matter, so the Debtor has not completed a detailed review of potential Chapter 5 Causes of Action to determine defenses available and collectability of such actions. **Therefore, the Debtor specifically reserves all of its rights related to any and all Chapter 5 Causes of Action that are determined to exist, specifically including, but not limited to, the Debtor's rights to file suit on potential Chapter 5 Causes of Action.**

## V.  SUMMARY OF PROPOSED PLAN

Unless otherwise ordered by the Court, the Claims Bar Date shall be shall be **June 25, 2015 for all creditors except governmental units** and shall be **August 10, 2015 for a governmental unit** as such dates were set forth in the Court's Notice of Chapter 11 Bankruptcy Case, Meeting of Creditors, & Deadlines issued on the Petition Date in this Case. **Debtor has filed a Motion to Shorten Claims Bar Date and the above dates may be shortened by Court Order, copies of which will be sent to all creditors and parties in interest**. Unless specifically ordered otherwise by the Court, only Claims scheduled by the Debtor without any contingent, unliquidated, or disputed notations and those Claims filed on or before the Claims Bar Date shall constitute Claims asserted against the Debtor in this Case. Any Claims filed after the Claims Bar Date shall be automatically disallowed unless the claimant successfully obtains an order of the Court allowing their late-filed proof of claim. **The Debtor specifically reserves its right to object to any scheduled or asserted claims prior to the closing of the bankruptcy case.**

Debtor's Plan calls for seventeen (17) classes of creditors and parties in interest consisting of two (2) secured creditors, administrative classes, four priority classes, a convenience class for vendors, seven classes of unsecured creditors, and an equity class.

### Plan Classifications

**Class 1.        SouthCoast Community Bank ("SouthCoast").        Secured, Unimpaired.** SouthCoast asserts claims against the Debtor aggregating to approximately $2,795,878 as of the Petition Date. The SouthCoast loans are believed to be secured by a perfected first priority mortgage in most of the Debtor's real property holdings. Debtor does not believe that SouthCoast has any lien or interest in its Cash Collateral. However, out of an abundance of caution, SouthCoast consented to the Debtor's use of Cash Collateral.

The Debtor proposes to pay SouthCoast in full from cash at closing.

**Class 2.        Edward L. Myrick, Sr. ("Myrick").    Secured, Impaired.**    As part of the pre-petition restructuring efforts, the Debtor borrowed $3,600,000 from Myrick.  The Myrick debt is evidenced by a promissory note, dated May 18, 2003 in the original principal amount of $3,600,000, executed and delivered by the Debtor to Myrick.  The Myrick Debt is secured by a Mortgage Security Agreement and Fixture Filing dated September 19, 2003 securing the original principal amount of $3,600,000 through a mortgage lien on substantially all the real property of the Debtor, but junior to the SouthCoast debt in circumstances where the liens are overlapping.

As of the Petition Date, approximately $3,890,732 remains due and owing to Myrick.  As stated in the Debtor's Sale Motion the Myrick debt will be assumed as part of the price paid by the Purchaser.  Myrick will become a member of Purchaser.  There are other Myrick claims, shown in other classes herein.

**Class 3.        Administrative Claims of the U.S. Trustee, Estate Professionals, and Post-Petition Operating Expenses.        Administrative Priority, Unimpaired.**  This class consists of quarterly fees of the United States Trustee and any unpaid administrative claims of professionals.  United States Trustee fees for the Debtor will be paid by the Debtor in full upon its due date and any amounts remaining due for quarterly fees will be paid prior to the closing of the bankruptcy case.

The Debtor currently estimates post-petition professional fees in the aggregate amount of approximately $100,000.   Post-petition professional fees incurred through the date of confirmation will only be paid upon Court approval.  Unless otherwise ordered by the Court, post-petition professional fees incurred through the date of confirmation will be paid in full. Post-confirmation, professional fees, if any, will be paid monthly in the ordinary course.

All of the Debtor's post-petition operating expenses will be paid in full in the ordinary course of business.

**Class 4.        Briar's Creek Golf, LLC Employees ("Employees").        Priority, Unimpaired.**  The Debtor has approximately 50 employees.   The Debtor will continue to employ the Employees in the ordinary course of its business without any interruption of work schedule or pay schedule through the closing of the Sale to Purchaser. As of the Petition Date, Employees had accrued vacation and benefits due in the approximate aggregate amount of $56,000 for time worked prior to the Petition Date.   The Debtor estimates that between the

Petition Date and the closing date contemplated by the Sale Motion and APA, an additional $14,000 will accrue in paid time off and vacation creating an aggregate claim of approximately $70,000, which will be paid pro-rata between seller (Debtor) and Purchaser.  The Debtor has filed a motion seeking authorization to pay accrued pre-petition wages in full.  All post-petition wages, benefits, and insurance premiums will be paid from the Debtor's operating account in the ordinary course of business at the regularly scheduled dates.

Upon confirmation of the Plan and pursuant to the APA attached to the Sale Motion, any and all Allowed Claims in this class shall have been paid in full in part by Debtor and in part paid by Purchaser.

**Class 5.**       **Internal Revenue Service ("IRS").  Priority, Unimpaired.**       Except with regard to the approximately $5,460.93 in federal payroll taxes which the Debtor seeks to pay by way of its first day accrued wage motion in this matter, the Debtor believes and asserts that it is current with any and all income and payroll taxes with the IRS.  However, to any extent it is determined that the Debtor owes additional pre-petition taxes to the IRS, then such taxes will be paid in full upon the Effective Date of the Plan or such later date as they come due. Post-petition, any and all IRS taxes shall be kept current and paid in full from the Debtor's operating account.

**Class 6.**       **South Carolina Department of Revenue ("SCDOR").    Priority, Unimpaired.**  Except with regard to the approximately $2,678.61 in state payroll taxes which the Debtor seeks to pay by way of its first day accrued wage motion in this matter, the Debtor believes and asserts that it is owes the SCDOR $113.15 for liquor taxes but is otherwise current with any and all other excise, unemployment, income, and payroll taxes owed to SCDOR.  The $113.15 owed in pre-petition liquor taxes to SCDOR will be paid in full upon the Effective Date of the Plan or such later date as they come due. Post-petition, any and all taxes owed to SCDOR shall be kept current and paid in full from the Debtor's operating account.

**Class 7.**       **Charleston County, South Carolina ("Charleston County").  Priority, Unimpaired.**  The Debtor believes and asserts that all ad valorem property taxes that became due to Charleston County pre-petition were paid prior to the Petition Date.  To the extent it is determined that any pre-petition ad valorem taxes went unpaid, such pre and also the pro rated post petition portion of property taxes will be paid in full pursuant to the APA attached to the Sale Motion.

**Class 8.**         **Contract Rejection Damages and Unpaid Lease Payments ("Contract Claims").  Unsecured, Impaired.**  Though the Debtor does not anticipate any such claims, this class includes any and all Allowed Claims for lease rejection damages.  Section 365(a) provides that a debtor in possession "subject to the Court's approval, may assume or reject any executory contract or unexpired lease of the Debtor."  11 U.S.C. § 365(a). Section 365(b) requires such debtor in possession to satisfy certain requirements, such as cure, compensation and adequate assurance of future performance, at the time of assumption if a default exists under the contracts to be assumed.  See 11 U.S.C. § 365(b)(1)(A)-(C).

By way of its Sale Motion, the Debtor seeks to have the Purchaser or other successful bidder assume all executory contracts of the debtor and, upon the entry of a final order approving the sale, assign such contracts to the Purchaser or other successful bidder.  It is the Debtor's position that no cure is required to be paid in connection with the assumption of such contracts pursuant to § 365(b).

Rejection claims, if any, related to any Contract Claims will be paid at closing.

**Class 9.**         **General Unsecured Trade Vendors ("Trade Creditors").   Unsecured, Impaired.**  This Class is a convenience-type of class that includes the Debtor's Trade Creditors with whom it does business as a part of its normal operations.  As of the Petition Date, the Debtor believes it owes its approximately 33 general unsecured trade vendors the approximate amount of $123,142.

Any pre-petition Allowed Claims of general unsecured Trade Creditors in this Class will be paid in full, without interest, within ninety (90) days after the Effective Date of the Plan.

The post-petition amounts due to general Trade Creditors are not included in this Class.  Post-petition amounts due to trade creditors will be paid in full as administrative priority claims in the ordinary course of the Debtor's business dealings with its trade creditors as set forth in the classes above.

**Class 10.**        **General Unsecured Creditors.**        **Unsecured, Impaired.**        This class of creditors consists of all allowed unsecured claims against the Debtor that have not been previously identified.  There are approximately two (2) creditors in this class in the aggregate amount of approximately $64,367.

Claims in Class 10 shall receive a pro-rata distribution of the Sale Proceeds from Debtor's Estate.  The ultimate distribution rate on claims in this class will not be finally determined until the Court has approved the Sale Motion and such sale has closed.  Assuming that the sale is approved and the Debtor continues to operate at a break-even cash flow through closing, as presently projected, the distribution rate will be approximately 33%.  If sale proceeds are greater, the Debtor operates at a loss, or claims increase, the distribution rate will be adjusted.

**Class 11.**        **Developer Claims.**        **Unsecured, Impaired.**        This class consists of the unsecured, pre-petition claims of Edward L. Myrick, Sr. ("Myrick") and Steve Koenig ("Koenig") in their capacity as creditors related to the development of the property in the approximate amount of $750,000.  Pursuant to § 3.5 of the Restructuring Agreement attached as **Exhibit F**.  This obligation is subordinated to the Membership Deposits due under the Amended Membership Plan.

The Claims in Class 11 are waived with the consent of Myrick and Koenig.  Upon the occurrence of the Effective Date, all Class 11 claims will be waived and extinguished.  Class 11 will not participate in any distribution from the Debtor's Estate.

**Class 12.**        **Founder Loans.**        **Unsecured, Impaired.**        This class of creditors consists of the subset of the Membership who made capital contributions to the Debtor ("Founders").   There are 16 Founders with an aggregate amount due of $3,620,049 (the "Founder Loans").  A complete list of the Founder Loans is attached at **Exhibit B**.  Holders of Class 12 claims will receive no distribution pursuant to this Plan and are asked to review **Exhibit B** and to timely file a Proof of Claim if they disagree with the claim amount described.

The Claims in Class 12 will be waived with the consent of the Founders.  Upon the occurrence of the Effective Date, all Class 12 claims will be waived and extinguished.  Class 12 will not participate in any distribution from the Debtor's Estate.

**Class 13.**        **Equity Holders ("Equity Interests").  Equity Holder, Impaired.**

This Class consists of the Equity Interests in the Debtor.  Upon the occurrence of the Effective Date, all Class 13 claims will be waived and extinguished.  Class 13 will not participate in any distribution from the Debtor's Estate.

**Class 14.**        **Patron Loans.**        **Unsecured, Impaired.**        This class of creditors consists of the subset of the Golf Membership who made future advances under the Debtor's Patron Program ("Patron Loans").  The Patron Loans were designed to bear interest at the rate of 5% due and payable in annual installments starting November 12, 2010 and scheduled to reach maturity on November 12, 2019.  The Debtor was unable to make the interest payment due on November 12, 2014; therefore such interest is included in the claims of the Club Patrons.  A complete list of the 25 Patron Members is attached as **Exhibit E**.  The aggregate balance for all of the Patron Loans is $2,930,533.89.

Each Claimant in Class 11 will receive a pro rata distribution based upon the amount of their Claim shown on **Exhibit E**.  The ultimate distribution rate on claims in this class will not be finally determined until the Court has approved the Sale Motion and such sale has closed. Assuming that the sale is approved and the Debtor continues to operate at a break-even cash flow through closing, as presently projected, the distribution rate will be approximately 33%.  If sale proceeds are greater, the Debtor operates at a loss, or claims increase, the distribution rate will be adjusted.

**Class 15.**        **Present Refundable Members.**        **Unsecured, Impaired.**        The Creditors in Class 15 consist of the present membership of the Debtor holding memberships, which are refundable under the Membership Plan ("Refundable Memberships").  Pursuant to the Membership Plan, all refundable memberships are to be refunded in full upon thirty (30) years of membership in good standing.   There are currently 127 Refundable Memberships with an aggregate claim of $14,460,350, as fully described on **Exhibit C** attached hereto.

The Claims in Class 15 will be adjusted for net present value based upon the date when such membership would be refunded in the future.   The net present value of claims for Refundable Members is shown on the attached **Exhibit C** and the aggregate net present value of all Class 14 Claims is $4,599,808.22.  All Refundable Members shall be offered the opportunity to participate as members of the New Club, without paying further membership fees.

The ultimate distribution rate on claims in this class will not be finally determined until the Court has approved the Sale Motion and such sale has closed.  Assuming that the sale is approved and the Debtor continues to operate at a break-even cash flow through closing, as presently projected, the distribution rate will be approximately 33%.  If sale proceeds are greater,

the Debtor operates at a loss, or claims increase, the distribution rate will be adjusted.

**Class 16.**    **Resigned Members.  Unsecured, Impaired.**    This class of creditors consists of those former Club Members who held refundable memberships, but resigned from their membership pre-petition ("Resigned Members").   Pursuant to the Debtor's Membership Plan and the various Membership Agreements, memberships were to be refunded on the basis that for every three memberships sold, the fourth membership would refund the membership deposit of a Resigned Member.  As part of the 2009 Restructuring Agreement, this methodology was adjusted and approved by a majority of Club members.  The March 2010 Amendment to the Membership Agreement specifies that when $400,000 of new membership fees are received, the next Resigned Member in the queue is refunded. There are 77 Resigned Members holding claims in the approximate aggregate amount of $8,865,000.   A complete listing of the Resigned Members and their pre-petition claim amounts is attached as **Exhibit D.**

The Claims in Class 16 will be discounted for present value based upon the date that their Membership Refund would have been paid in the future.  The present value of claims for Resigned Members is shown on the attached **Exhibit D** and the aggregate present value of all Class 16 Claims is $4,045,011.88.  Following discount to present value, the Class 16 Claims will then receive a pro rata distribution within fourteen (14) days of the Effective Date.  Resigned Members shall be offered the opportunity to participate as members of the Reorganized Debtor, without paying further membership fees.

The ultimate distribution rate on claims in this class will not be finally determined until the Court has approved the Sale Motion and such sale has closed.  Assuming that the sale is approved and the Debtor continues to operate at a break-even cash flow through closing, as presently projected, the distribution rate will be approximately 33%.  If sale proceeds are greater, the Debtor operates at a loss, or claims increase, the distribution rate will be adjusted.

**Class 17.**    **Non-Refundable Members. Unsecured, Unimpaired.**    The Creditors in Class 17 consist of those non-refundable memberships under the Debtor's Membership Plan ("Non-Refundable Members").   There are 71 Non-Refundable Members as shown on the attached **Exhibit G**.  The Non-Refundable Members will not participate in a distribution from the Debtor's Estate, but shall be offered the opportunity to participate as members of the Reorganized Debtor, without paying further membership fees.

## VI.    EXECUTORY CONTRACTS

The Debtor intends to continue its normal operations in the ordinary course post-petition until the occurrence of the Sale Date.   Upon the Sale Date, the Debtor anticipates that the Purchaser shall assume all of the Executory Contracts, which Executory Contracts are shown in Schedule G of the Bankruptcy Schedules for the Debtor.   Schedule G is also attached to this Disclosure Statement as **Exhibit K**, and there are not believed to be any cure amounts due as evidenced by the Debtor's Schedule F filed with the Court.   Any and all cure amounts owed for Allowed Claims due to the assumption of Executory Contracts will be treated as Administrative Claims and will be paid in full as set forth in <u>Class 8</u> hereinabove.

## VII.    LIQUIDATION AND OTHER ALTERNATIVES TO PLAN CONFIRMATION

There are three (3) possible consequences if the Plan is rejected or if the Bankruptcy Court refuses to confirm the Plan: (a) the Bankruptcy Court could dismiss the Debtor's Bankruptcy Case; (b) the Bankruptcy Court could consider alternative plans of reorganization or orderly liquidation, or (c) the Bankruptcy Court could convert the Debtor's Bankruptcy Case to a liquidation case under Chapter 7 of the Bankruptcy Code.   These alternatives are described briefly below.

### Dismissal

Were the Debtor's Bankruptcy Case dismissed, the Debtor would no longer have the protection of the Bankruptcy Court and the applicable provisions of the Bankruptcy Code. Dismissal would force a race among creditors to take over and dispose of any remaining property of the Debtor.   Any secured creditors would likely exercise their rights as secured creditors to foreclose and seize the Debtor's assets.   Other creditors would quickly move to obtain and/or exercise judgments against the Debtor and its assets.   Absent some sort of stay pending any appeal, judgment creditors would race to the courthouses to attempt to liquidate and collect against the Debtor's assets.  A dismissal of the Chapter 11 case would likely lead to the ultimate closing and shut down of the Debtor's business operations, which in turn would lead to significantly lower and uneven distributions to the Debtor's creditors.   Given the amount of secured claims asserted against the Debtor and the value of the Debtor's assets, unsecured Claims would likely receive a significantly lower distribution if the Debtor's case were

dismissed.

### Confirmation of an Alternative Plan

If the Plan is not confirmed, the Debtor or any other party in interest could attempt to formulate a different plan of reorganization or liquidation.  Any plan that does contemplate the Debtor's continuing operations (i.e., a liquidation or limited operations plan) would likely lead to significantly delayed payment, lower payment, or no payments to many creditors.

### Chapter 7 Liquidation

If The Debtor were forced to shut down and quickly liquidate its assets under a chapter 7 trustee, there would be little, if any, recovery for the unsecured creditors of the Debtor's estate. The Plan also offers the opportunity of avoiding additional administrative costs and delays that would result from a Chapter 7 liquidation.  In addition to lower asset values in a liquidation, a Chapter 7 Trustee would, at a minimum, retain his/her own counsel, who would ordinarily need to devote a substantial amount of time reviewing the status of Claims and getting up to speed on various matters. Such review would include a substantial amount of time duplicating tasks previously performed by other professionals in the case, thereby increasing both the costs and the time necessary to liquidate the Estate.  Statutory fees paid to the Chapter 7 Trustee would even further deplete the Estate.

## VIII.   FEASIBILITY OF THE PLAN

The Debtor believes and asserts that it has the ability to repay all creditors as set forth herein.   11 U.S.C.  §1129(a)(11) provides that in order for a plan of reorganization to be confirmed, it must be demonstrated that the plan is not likely to be followed by a liquidation or the need for further reorganization of the debtor.   The Debtor's Plan calls for the orderly liquidation of the Debtor's assets.  Based upon the APA attached to the Sale Motion, the Debtor believes that it can demonstrate the ability to pay the debts called for in Classes 1-17 of the Plan, therefore the Debtor asserts that the Plan is not likely to be followed by further liquidation or the need for further reorganization of the Debtor.

## IX.        FURTHER FINANCIAL INFORMATION

The Debtor has filed its Schedules with the Bankruptcy Court as required by the Bankruptcy Code. The Debtor may also supplement and amend its Schedules as may be necessary and appropriate from time to time. The Debtor will file monthly operating reports until

the Case is closed. Due to their voluminous nature, neither monthly reports nor the Debtor's Schedules have been included in this Disclosure Statement.  However, all of the Debtor's filings may be examined at the Clerk's Office, United States Bankruptcy Court, District of South Carolina, J. Bratton Davis United States Court House, 1100 Laurel Street, Columbia, SC 29202. A copy of the Debtor's filings in this Case can also be obtained on the Bankruptcy Court's electronic      database      (Pacer)      located      at      its      web      page (www.scb.uscourts.gov/webpacer/webpacer.htm) or by contacting Debtor's counsel.

Creditors seeking further financial information may contact Debtor's counsel at bmccarthy@mccarthy-lawfirm.com and hpenn@mccarthy-lawfirm.com to request further information regarding the Debtor.  The Debtor will make every effort to respond to specific, reasonable requests for any non-privileged, non-confidential information.

## X.    CERTAIN RISK FACTORS TO BE CONSIDERED

Although a more detailed analysis follows, readers should be aware that Briar's Creek has attempted to look at risk to creditors and Golf Members if the Plan is not approved.  Debtor believes the worst case is that the Debtor quickly or slowly runs out of funds with which to pay refundable golf members, operating expenses, course upkeep and debt service, which would precipitate foreclosure by secured creditors.  In such a foreclosure scenario, the claims of employees and trade creditors could be wiped out or paid less.  It is possible that the quality of course upkeep and play structure could be jeopardized if the buyer at foreclosure sale was unable to maintain sufficient reserves.

Debtor recognizes that the best Plan would be a sale in which the course remains open under the present model of use and play, all employees are retained, funds are set aside for operating reserves and capital improvements, and all creditors and equity holders receive payment of all liabilities in full at face amount.  The bid price of such a hypothetical sale is in excess of $50,000,000.

The Debtor's Plan has arranged a bidder for the Estate who will keep the course open under the present model of use and play including the No Tee Times policy, retain all employees, create a large operating and capital improvements reserve, assume and assign all executory contracts, pay all secured claims and ongoing trade vendors in full, pay the Golf Members and Patrons a significant amount AND allow for a sale hearing where competing bids may be offered and the possibility of even higher payments to creditors may take place.

Holders of Claims against and Equity Interests in the Debtor should read and consider carefully the factors set forth below, as well as the other information set forth in this Disclosure Statement (and the documents delivered together herewith and/or incorporated by reference), prior to voting to accept or reject the Plan. These risk factors should not, however, be regarded as constituting the only risks involved in connection with the Plan and its implementation.

## A. Risk of Non-Confirmation of Plan

Although the Debtor believes the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion.  If Confirmation of the Plan is denied or revoked, the Plan shall be null and void in all respects. Nothing contained in the Plan or the Disclosure Statement shall: (1) constitute a waiver or release of any Claims by, against, or Equity Interest in, the Debtor; (2) prejudice in any manner the rights of the Debtor; or (3) constitute an admission, acknowledgment, offer or undertaking by the Debtor in any respect. The Debtor reserves the right to revoke, withdraw, or amend the Plan and Disclosure Statement prior to Confirmation. Moreover, there can be no assurance that modifications to the Plan will not be required in order to obtain Confirmation or that such modifications would not necessitate a re-solicitation of votes. If the Debtor revokes or withdraws the Plan, then the result of this shall be the same as if the Order Confirming Plan had not been entered.

## B.  Risk of No Sale

In addition to the risks related to obtaining Confirmation described above, the ultimate recovery under the Plan depends upon the Debtor's ability to sell its business to a willing buyer. Though the Debtor believes it will close its transaction with the Purchaser, there is always a risk that the sale will not close.  The Debtor has done its best to enter into an APA that will result in a sale, which will close thereby creating a recovery for Debtor's creditors.

## XI. TAX CONSEQUENCES

Subject to the limitations noted below, the following discussion is a summary of certain U.S. federal income tax consequences expected to result from the implementation of the Plan relevant to holders of Claims entitled to vote with respect to adoption of the Plan. This discussion is based on the Internal Revenue Code of 1986, as amended (the "Revenue Code"), in

effect on the date of this Disclosure Statement, on U.S. Treasury Regulations in effect (or in certain cases, proposed) on the date of this Disclosure Statement, and on judicial and administrative interpretations thereof available on or before such date. All of the foregoing is subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below, and no ruling from the IRS or opinion of counsel has been sought with respect to any issues that may arise under the Plan.

The following summary is for general information only and does not purport to address all of the U.S. federal income tax consequences that may be applicable, including to any particular Claim holder or Equity Interest. The tax treatment of a holder of a Claim or a Claim of Interest will vary depending upon such holder's particular situation. The following discussion does not address state, local or foreign tax considerations that may be applicable to the Debtor or to a holder of a Claim or an Equity Interest. This summary does not address tax considerations applicable to holders that may be subject to special tax rules.

No statement in this Disclosure Statement should be construed as legal or tax advice. The Debtor and its professionals do not assume any responsibility or liability for tax consequences that the holder of a Claim or an Equity Interest may incur as a result of the treatment afforded a Claim or Equity Interest under the Plan.

EACH HOLDER OF A CLAIM OR AN INTEREST IS URGED TO CONSULT ITS OWN TAX ADVISOR WITH RESPECT TO THE PLAN, INCLUDING ANY APPLICABLE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE PLAN.

TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY HOLDERS OF CLAIMS OR EQUITY INTERESTS FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED UNDER THE REVENUE CODE; (B) SUCH DISCUSSION IS BEING USED IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTOR; AND (C) HOLDERS OF CLAIMS OR EQUITY INTERESTS SHOULD SEEK ADVICE OF AN INDEPENDENT TAX ADVISOR BASED ON THEIR PARTICULAR CIRCUMSTANCES.

A. **Federal Tax Consequences to the Debtor**

The Debtor is a member-managed limited liability company who has elected to be treated as a partnership for income tax purposes.  The Equity Interests in the Debtor are held 2.1% by Adelphia Communications Corp, 3.243% by David T. Bailey, 3.243% by Douglas H. Dittrick, 3.943% by Edward L. Myrick, Jr., 24.319% by Edward L. Myrick, Sr., 3.243% by Henry H. Greer, 3.943% by James T. Myrick, 2.1% by Jeffery R. Immelt, 5.333% by John D. Carifa, 3.943% by Kenneth W. Sawyer, 3.243% Michael S. Martin, 3.243% Paul G. Edwards, 3.243% Paul G. Kimball, 3.243% Peter B. Bartlett Estate, 3.635% Peter R. Kellogg, 3.243% Robert C. McNair, 3.243% Roger G. Ackerman, 18.255% Steven J. Koenig, and 3.243% Woodrow S. Hancock.  As a limited liability company, the Debtor is a pass through entity for federal income tax purposes. As a result, any income tax liabilities or other attributes arising as a result of or in connection with the execution of the Plan will generally flow through to the Debtor's members ("Partners").

Subject to certain limitations, any losses reported on previous tax returns were passed through to the Partners. These losses and any refunds or tax benefits attributable thereto are personal to the Partners, and are not available to creditors as an asset of the Debtor.

Some of the Debtor's debts cannot be paid in full under the Plan and will therefore likely be deemed partially discharged for tax purposes even though the Plan, as a liquidating chapter 11 plan, does not provide for a bankruptcy discharge.  As a result, the Debtor may recognize cancellation of indebtedness ("COD") income in an amount equal to any effectively discharged debt, to the extent the accrual of such debt has generated a tax deductible expense for, or was capitalized and included in the tax basis of assets of, the Debtor.  At the partnership level, income from the discharge of partnership debt is treated as an item of income, which is allocated separately to each Partner.  Each Partner's distributive share of such income is determined under the partnership agreement, or on the basis of each partner's interest in the partnership, taking into account all of the facts and circumstances in the absence of a provision in the partnership agreement or if the allocation under the agreement does not have "substantial economic effect." At the partner level, the basis of each Partner's interest in the partnership is increased by the Partner's distributive share of taxable income and partnership income.  In addition, a decrease in partnership liabilities such as is attributable to COD income is treated as a distribution of money by the partnership that, in turn, each Partner's basis in his partnership interest to the extent of the

Partner's share of the canceled indebtedness and gives rise to the recognition of gain to the extent the COD income exceeds a Partner's basis in his partnership interest.

In a partnership, the general rule of Revenue Code Section 108(d)(6) is that exclusions of COD income from recognition and the basis and attribute reduction rules are applied at the Partner level and not at the partnership level. Each Partner's individual circumstances will determine whether the COD income allocated to such Partner is recognized or excluded from recognition under the rules of Revenue Code Section 108.

## B. Federal Tax Consequences to Holders of Claims or Equity Interests

The federal income tax consequences of the implementation of the Plan to the holders of Allowed Claims or Equity Interests will depend on, among other things, the consideration to be received by the Claim holder, whether the Claim or Interest holder reports income on the accrual or cash method, whether the Claim or Interest holder receives distributions under the Plan in more than one taxable year, whether the claim represents an investment or a personal asset and whether the Claim holder has previously taken any bad debt deduction or a worthless security deduction with respect to its Claim.

In general, a holder of an Allowed Claim should recognize gain or loss equal to the amount realized under the Plan in respect of its Claim less the holder's tax basis in the Claim. Any gain or loss recognized may be long-term or short-term capital gain or loss or ordinary income or loss, depending upon the nature of the Allowed Claim and the holder, the length of time the holder held the Claim and whether the Claim was acquired at a market discount. If the holder realizes a capital loss, the holder's deduction of the loss may be subject to limitation. The holder's tax basis for any property received under the Plan generally will equal the amount realized. The holder's amount realized should equal the sum of the Cash and the fair market value of any other property received by the holder under the Plan, less the amount (if any) treated as interest, as discussed below.

Because certain holders of Allowed Claims may receive Cash distributions after the Effective Date, the imputed interest provisions of the Code may apply and cause a portion of the subsequent distributions to be treated as interest. Additionally, because holders may receive distributions with respect to an Allowed Claim in a taxable year or years following the year of the initial distribution, any loss and a portion of any gain realized by the holder may be deferred.

All holders of Allowed Claims are urged to consult their tax advisors regarding the possible application of (or ability to elect out of) the "installment method" of reporting with respect to their Claims.

Holders of Allowed Claims will recognize ordinary income to the extent that they receive Cash or property that is allocable to accrued but unpaid interest that the holder has not yet included in its income. If an Allowed Claim includes interest, and if the holder receives less than the amount of the Allowed Claim pursuant to the Plan, the holder must allocate the Plan consideration between principal and interest.  Holders of Allowed Claims should consult their own tax advisors in this regard. If the Plan consideration allocable to interest with respect to an Allowed Claim is less than the amount that the holder has previously included as interest income, the previously included but unpaid interest may be deducted, generally as a loss.

A holder who receives in respect of a Claim or an Interest an amount less than the holder's tax basis in the Claim or Interest may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction in some amount under Section 166(a) of the Code, a loss under Section 165(a), or a worthless securities deduction under Section 165(g) of the Code. The rules governing the character, timing and amount of bad debt, loss, and worthless securities deductions place considerable emphasis on the facts and circumstances of the holder, the obligor and the instrument with respect to which a deduction is claimed. Holders of Claims or Interests, therefore, are urged to consult their tax advisors with respect to their ability to take such a deduction.

### C.  Backup Withholding Tax and Information Reporting Requirements

U.S. federal backup withholding tax and information reporting requirements generally apply to certain payments to certain non-corporate Claim holders. Information reporting generally will apply to payments under the Plan, other than payments to an exempt recipient. The Debtor may be required to withhold backup withholding tax from any payments made under the Plan, other than payments to an exempt recipient, if such Claim holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements.

THE ABOVE SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES

ONLY. THIS DISCLOSURE STATEMENT IS NOT INTENDED, AND SHOULD NOT BE CONSTRUED, AS LEGAL OR TAX ADVICE TO ANY CREDITOR OR EQUITY INTEREST HOLDER. ALL HOLDERS OF CLAIMS OR INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS WITH RESPECT TO THE U.S. FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE IMPLEMENTATION OF THE PLAN.

## XII. CONCLUSION

The Creditors, parties in interest, and readers of this Disclosure Statement are directed to the Plan of Liquidation for specific treatment of their particular claims against the Debtor.

The Debtor reserves all of its rights to amend this Disclosure Statement as necessary, pursuant to the terms of the Bankruptcy Code and rules of the Court, specifically including rights to file any amendments necessary to address new financial information and analyses as well as to address any other relevant information that may be discovered.

RESPECTFULLY SUBMITTED on this the 27th day of February 2015, at Columbia, South Carolina.

MCCARTHY LAW FIRM, LLC

By:    /s/G. William McCarthy, Jr..
        G. William McCarthy, Jr., I.D.#2762
        Daniel J. Reynolds, Jr., I.D.#9232
        W. Harrison Penn, I.D.#11164
        *Attorneys for the Debtor*
        1517 Laurel Street
        P.O. Box 11332
        Columbia, SC 29201-1332
        (803) 771-8836
        (803) 765-6960 (fax)
        hpenn@mccarthy-lawfirm.com